**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-2351**

RLM COMMUNICATIONS, INC.,

Plaintiff - Appellant,

v.

AMY E. TUSCHEN; ESCIENCE AND TECHNOLOGY SOLUTIONS, INC.,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Louise W. Flanagan, District Judge. (5:14-cv-00250-FL)

Argued: March 24, 2016          Decided: July 28, 2016

Before KING, DIAZ, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge King and Judge Harris joined.

**ARGUED:** R. Jonathan Charleston, THE CHARLESTON GROUP, Fayetteville, North Carolina; Coy E. Brewer, Jr., COY E. BREWER, JR., ATTORNEY AT LAW, Fayetteville, North Carolina, for Appellant. Michael Coghlan Lord, WILLIAMS MULLEN, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Jose A. Coker, Dharmi B. Tailor, THE CHARLESTON GROUP, Fayetteville, North Carolina, for Appellant.

DIAZ, Circuit Judge:

After working for six years at RLM Communications, Inc., Amy Tuschen resigned and joined a competitor, eScience and Technology Solutions, Inc. Although RLM and eScience had offices just a few miles from each other, RLM did not initially object to Tuschen's move. Later, however, RLM discovered that eScience was planning to bid against it on a government contract very similar to one that Tuschen had managed during her tenure at RLM. RLM also learned that Tuschen was soliciting her former RLM colleagues to join eScience in the event her new employer won the contract.

RLM brought multiple claims against eScience and Tuschen, alleging principally that Tuschen breached a covenant not to compete and unlawfully took confidential information from RLM and shared it with eScience. After discovery, the district court granted summary judgment to eScience and Tuschen on all of RLM's claims. Because the covenant not to compete was not enforceable and RLM failed to present sufficient evidence that Tuschen took or shared RLM's confidential information, we affirm.

I.

A.

RLM is a government contractor specializing in services such as cyber security, information technology, information assurance (i.e., managing the various risks associated with an organization's information and data systems), and management support. On June 5, 2007, Tuschen signed an offer letter from RLM, accepting a position as a Training and Development Representative. In this role, Tuschen was to provide instruction at the U.S. Army Leader College of Information Technology at Fort Gordon, Georgia. On her first day of work, Tuschen executed two more documents: a Confidentiality Agreement and a Covenant Not to Compete (the "Noncompete").[1]

Over the next six years, RLM promoted Tuschen several times, ultimately making her Director of Information Assurance. One of Tuschen's responsibilities in this position was to manage an information-assurance contract with the U.S. government (the "Contract"). The Contract was set to expire on June 30, 2014, at which time the government was to rebid the services as a new contract (the "Follow-on Contract"). About a year before the Contract expired, Tuschen gave RLM two weeks' notice of her resignation. Prior to departing, she copied several files

---

[1] We discuss these agreements in more detail below.

3

related to the Contract from her employer-issued laptop computer onto a CD, which she gave to her successor, Dennis Yelverton.

Before Tuschen's departure, RLM learned that she planned to join eScience, a competing federal contractor with an office just down the street from RLM. Not only did RLM not object to Tuschen's plan to work for eScience, but it gave her $1,000 in gift cards and a "giant bouquet of roses" as parting gifts. J.A. 257.

Within days of resigning from RLM, Tuschen began working for eScience as its Director of Cyber and IT Solutions. At eScience, she was charged with helping the company develop a bid for the Follow-on Contract and with reaching out to former colleagues at RLM to secure their services should eScience win the Follow-on Contract. She contacted several RLM employees for this purpose.

Meanwhile, the government issued its request for proposals for the Follow-on Contract in May 2014. This led to some technical jockeying between RLM and eScience over how large a company would be permitted to serve as prime contractor. The original request for proposals assigned the Follow-on Contract a North American Industry Classification System (NAICS) code that had the effect of enabling eScience to bid as prime contractor but disqualifying the larger RLM. But the day after the request for proposals was released, the government amended it, assigning

4

a different NAICS code that would allow RLM to bid as prime contractor.

Seeking to avoid competition from larger firms such as RLM, eScience appealed to the U.S. Small Business Administration, which reinstated the original NAICS code. It was a fleeting victory: RLM, which could participate in a bid as a subcontractor rather than as prime contractor, was part of the team that won the Follow-on Contract.

B.

RLM filed suit in North Carolina state court against Tuschen and eScience, seeking a temporary restraining order ("TRO") and asserting nine claims: (1) breach of contract (related to the Noncompete); (2) breach of contract (related to the Confidentiality Agreement); (3) unfair and deceptive trade practices; (4) tortious interference with contractual relations; (5) misappropriation of trade secrets; (6) unjust enrichment; (7) civil conspiracy; (8) preliminary and permanent injunction; and (9) conversion. The state court granted the TRO, and Tuschen and eScience removed to federal court, where they moved to dismiss all claims.

The district court converted their motion to dismiss into a motion for summary judgment to be supplemented after discovery. RLM quickly moved for a TRO and a preliminary injunction (as relevant here). The district court granted a TRO on the same

5

terms set forth in state court, but soon after replaced it with a preliminary injunction based in part on the parties' consent. It also converted the request for a preliminary injunction into a motion for a permanent injunction.

In November 2014, the district court granted Tuschen and eScience's motion for summary judgment on all claims and denied RLM's motion for a permanent injunction. RLM Commc'ns, Inc. v. Tuschen, 66 F. Supp. 3d 681 (E.D.N.C. 2014).

This appeal followed.

## II.

We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to RLM, the nonmovant. See Askew v. HRFC, LLC, 810 F.3d 263, 266 (4th Cir. 2016). We may affirm "on any legal ground supported by the record and are not limited to the grounds relied on by the district court." Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir. 1993). Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because we are sitting in diversity, addressing matters of North Carolina law, we apply governing North Carolina law or, if necessary, predict how the Supreme Court of North Carolina would rule on an unsettled issue. See Askew, 810 F.3d at 266.

6

On appeal, RLM has abandoned its unjust-enrichment claim. We address the remaining issues in the following order: breach of the Noncompete, breach of the Confidentiality Agreement, misappropriation of trade secrets, conversion, tortious interference with contractual relations, unfair and deceptive trade practices, civil conspiracy, and permanent injunction.

III.

First, RLM faults the district court for granting summary judgment on its claim that Tuschen breached the terms of the Noncompete. The district concluded that the Noncompete was invalid for lack of consideration. Tuschen, 66 F. Supp. 3d at 693. In RLM's view, however, the Noncompete was part of the larger employment contract, and so employment itself was the consideration. Moreover, RLM argues, even if the Noncompete was a separate contract requiring separate consideration, it recited adequate consideration, promising that RLM would give Tuschen access to "company private information." Appellant's Br. at 28. In Tuschen and eScience's view, the Noncompete was not part of the employment contract, and the recited consideration was illusory because RLM never promised to provide Tuschen access to the company private information. In the alternative, they argue that the Noncompete is impermissibly broad.

7

Because we agree with Tuschen and eScience that the Noncompete is overbroad, we do not address the consideration issues.[2]

Covenants not to compete are disfavored in North Carolina. See Kadis v. Britt, 29 S.E.2d 543, 546 (N.C. 1944); VisionAIR, Inc. v. James, 606 S.E.2d 359, 362 (N.C. Ct. App. 2004). They are valid only if they are "(1) in writing; (2) made a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest of the employer." Farr Assocs., Inc. v. Baskin, 530 S.E.2d 878, 881 (N.C. Ct. App. 2000). The restrictions on an employee's future employment "must be no wider in scope than is necessary to protect the business of the employer." Manpower of Guilford Cty., Inc. v. Hedgecock, 257 S.E.2d 109, 114 (N.C. Ct. App. 1979).

More specifically, "restrictive covenants are unenforceable where they prohibit the employee from engaging in future work that is distinct from the duties actually performed by the employee." Med. Staffing Network, Inc. v. Ridgway, 670 S.E.2d 321, 327 (N.C. Ct. App. 2009); see also Copypro, Inc. v.

---

[2] Similarly, we do not reach the issue of whether the Noncompete violates public policy as expressed by Executive Order Number 13495 (Jan. 30, 2009). See Appellees' Br. at 45-46.

8

Musgrove, 754 S.E.2d 188, 192 (N.C. Ct. App. 2014) ("[W]e have held on numerous occasions that covenants restricting an employee from working in a capacity unrelated to that in which he or she worked for the employer are generally overbroad and unenforceable.").

The Noncompete, in relevant part, provides as follows:

> While I, the Employee, am employed by Employer, and for **1** years/months afterward, I will not directly or indirectly participate in a business that is similar to a business now or later operated by Employer in the same geographical area. This includes participating in my own business or as a co-owner, director, officer, consultant, independent contractor, employee, or agent of another business.

J.A. 37.

The restriction on Tuschen's future employment is largely unmoored from RLM's legitimate business interests. Even ignoring for a moment the bar on indirect participation in similar businesses, the Noncompete is overly broad by preventing direct participation in similar businesses. Tuschen is not merely prohibited from working for RLM's competitors in a position like the one she held at RLM. She may also not mow their lawns, cater their business lunches, and serve as their realtor. See Hartman v. W.H. Odell and Assocs., Inc., 450 S.E.2d 912, 920 (N.C. Ct. App. 1994) (finding a covenant unenforceable where it "would appear to prevent plaintiff from

9

working as a custodian for any 'entity' which provides 'actuarial services'" (quoting the record)).

And if RLM were to take up software development as a new line of business (i.e., "a business . . . later operated by Employer"), Tuschen would be barred from working as a sales representative for a nearby software developer. See VisionAIR, 606 S.E.2d at 363 (striking down a restriction on selling software when sales work was "unrelated to that which [the employee] did for [the employer]"). The ban on indirect participation could have even more startling consequences: if Tuschen has retirement accounts invested in mutual funds, she may have to monitor their holdings to be sure she is not investing in companies similar to RLM. See id.

Such a broad prohibition on future employment (let alone investment) cannot be justified by RLM's legitimate business concerns. "With everything Tuschen knew . . . in her leadership positions," RLM asserts, "she could singlehandedly affect RLM's future in terms of its ability to bid on and secure upcoming contracts." Appellant's Br. at 34. Assuming this is true (despite RLM's beating out eScience for the Follow-on Contract), RLM's legitimate business interests fall well short of justifying the Noncompete's prohibitions.

Instead of focusing on employment that raises the risk that Tuschen will use knowledge obtained from RLM to RLM's detriment,

10

the Noncompete targets the similarity of a new employer to RLM. That is not a sufficient limiting factor for a covenant not to compete. See Henley Paper Co. v. McAllister, 117 S.E.2d 431, 434 (N.C. 1960) (holding that a covenant was overbroad where it barred a salesman of "fine" paper products from "'either directly or indirectly' engaging 'in the manufacture, sale or distribution of paper or paper products'"); Kinesis Advert., Inc. v. Hill, 652 S.E.2d 284, 294 (N.C. Ct. App. 2007) ("We have previously held that a covenant-not-to-compete is 'overly broad in that, rather than attempting to prevent [the former employee] from competing for [] business, it requires [the former employee] to have no association whatsoever with any business that provides [similar] services.'" (quoting Hartman, 450 S.E.2d at 920)). Simply put, the Noncompete is overly broad and cannot be enforced as written.[3]

RLM encourages us to take up North Carolina's "blue-pencil" doctrine and strike the offending language. Appellant's Br. at 35-36. Under this doctrine, a court "may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable." Hartman, 450 S.E.2d at 920. But North Carolina's blue-pencil rule "severely limits what the court may do to alter" an overly broad covenant not to compete. Id.

---

[3] We do not reach the question whether the Noncompete is reasonable as to time and territory.

11

"[W]hen an agreement not to compete is found to be unreasonable, . . . the court is powerless unilaterally to amend the terms of the contract." Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC, 784 S.E.2d 457, 461 (N.C. 2016). We therefore cannot rewrite the Noncompete to save it from its fatal flaws. Moreover, even if we assume blue-penciling were appropriate in this case, we do not see how it would help RLM. RLM suggests that we strike the term "indirectly," but we have already explained that a prohibition limited to direct participation in a similar business is overbroad.

Because the Noncompete is unenforceable and cannot be mended by blue-penciling, the district court properly dismissed the associated claim for breach of contract.

IV.

RLM's second breach-of-contract claim alleges that Tuschen violated the terms of the Confidentiality Agreement. The district court granted summary judgment, finding the cited consideration illusory. We assume without deciding that the Confidentiality Agreement was valid and affirm on the alternative ground that RLM has failed to put forth sufficient evidence of breach.

12

In relevant part, the Confidentiality Agreement reads as follows: "While I am employed by Employer and afterward, I will not, except in performing my duties, remove or copy any confidential information or materials or assist anyone in doing so without Employer's written permission." J.A. 39. In the Verified Complaint, RLM alleges that the breach occurred when "Tuschen disclosed confidential information acquired during her employment with RLM." J.A. 23. On appeal, RLM has pivoted to a new theory: Tuschen breached the Confidentiality Agreement merely by copying confidential information without permission and not in performance of her duties.

Tuschen readily admits that before she left RLM, she copied confidential information regarding the Contract from her employer-issued laptop onto a CD without written permission. The question is whether she did so "in performing [her] duties."

According to Tuschen, she made the CD to gather all of the files relevant to the Contract in "a single, one-stop source of information that [her successor, Dennis Yelverton,] would not otherwise have." J.A. 258. Although Tuschen knew that RLM would retain the laptop and all of the information in it, she believed the CD would ease the transition for Yelverton. She also testified that she gave the only copy to Yelverton, and RLM has conceded it has no evidence to the contrary.

13

Tuschen has also presented evidence that (1) Yelverton lacked access to many of the files on the CD and her computer was to be sent to a different office and would not be immediately available to Yelverton; (2) before she created the CD, RLM's Vice President of IT Services and Solutions had similarly created a CD for his successor when he resigned, and there had been no "Corporate pushback," J.A. 428; (3) no one at RLM objected upon learning that Tuschen had made the CD; (4) "[t]he CD was used extensively to access the information on it to manage the Contract following Ms. Tuschen's resignation," J.A. 429; and (5) Yelverton, upon his own resignation, "passed the CD to the incoming Program Manager as well as providing a copy of the CD to the Senior Program Manager," J.A. 434.

RLM provides no evidence to contradict Tuschen's contention that she created the CD to ease the transition for Yelverton. Nonetheless, RLM asserts that nobody told Tuschen to create the CD, and doing so was not a common practice at RLM. In most workplaces, however, such an employee would be lauded for her initiative, rather than accused of wrongdoing. Something more is required to raise an inference that Tuschen, as RLM's Director of Information Assurance and the person responsible for managing the Contract, was not performing her duties when she made the CD for her successor.

Because RLM has not shown a genuine issue of fact that Tuschen breached the Confidentiality Agreement, we affirm the grant of summary judgment as to this claim.

V.

RLM's misappropriation-of-trade-secrets claim is similar to its claim for breach of the Confidentiality Agreement. Here, RLM alleges not only that Tuschen created the CD, but also that she kept a copy for herself and shared confidential information with eScience.

A.

In North Carolina, "'[m]isappropriation' means acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C. Gen. Stat. § 66-152. The misappropriation statute also sets out a scheme for shifting the burden of production:

> Misappropriation of a trade secret is prima facie established by the introduction of substantial evidence that the person against whom relief is sought both:
> (1) Knows or should have known of the trade secret; and
> (2) Has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or

15

used it without the express or implied consent or authority of the owner.

This prima facie evidence is rebutted by the introduction of substantial evidence that the person against whom relief is sought acquired the information comprising the trade secret by independent development, reverse engineering, or it was obtained from another person with a right to disclose the trade secret. This section shall not be construed to deprive the person against whom relief is sought of any other defenses provided under the law.

Id. § 66-155.

The first prong of the prima facie case plainly requires that the defendant "[k]nows or should have known of the trade secret." Id. The second prong provides two alternatives, requiring that the defendant "[1] has had a specific opportunity to acquire [the trade secret] for disclosure or use or [2] has acquired, disclosed, or used it without the express or implied consent or authority of the owner." Id. (emphasis added). At first blush, this second prong appears to allow a plaintiff to show either that the defendant had an opportunity to acquire trade secrets or that the defendant in fact acquired them without permission.

But there is a problem with this reading. To understand why, it is first important to note the effect of a trade-secrets prima facie case in the context of summary judgment. Interpreting the phrase "prima facie evidence" in another statute, the Supreme Court of North Carolina has explained that "prima facie evidence means, and means no more, than evidence

16

sufficient to justify, but not to compel an inference" of the fact in question. Home Fin. Co. of Georgetown v. O'Daniel, 74 S.E.2d 717, 721 (N.C. 1953) (citing N.C. Gen. Stat. § 44-38.1(a) (repealed 1967)). Prima facie evidence "furnishes evidence to be weighed, but not necessarily to be accepted, by the jury. It simply carries the case to the jury for determination, and no more." Id. Therefore, a prima facie case of misappropriation permits a plaintiff to survive summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Collingwood v. Gen. Elec. Real Estate Equities, Inc., 376 S.E.2d 425, 427 (N.C. 1989).

In the employment context, if knowledge and opportunity suffice for a prima facie case of misappropriation, then an employer can state a prima facie case against its employee merely by showing that it gave the employee access to its trade secrets. The employer can therefore force such an employee to go to trial on a misappropriation claim—unless the employee can rebut the prima facie case. Unfortunately, the statute does not clearly address rebuttal in a case such as this one, where the employee claims that she never acquired or used trade secrets at all. The statute provides three grounds for rebutting the prima facie evidence, but all grounds assume that the employee has in fact acquired the trade secrets: "prima facie evidence is rebutted by the introduction of substantial evidence that the

17

person against whom relief is sought acquired the information comprising the trade secret by independent development, reverse engineering, or it was obtained from another person with a right to disclose the trade secret." § 66-155. If these grounds were exclusive, an absurd result would follow: Every employee in North Carolina who had access to her employer's trade secrets but did not acquire them would have to go to trial to fend off the employer's claim of misappropriation.

B.

We do not think the Supreme Court of North Carolina, which has not had occasion to consider the meaning of the statute, would adopt such an interpretation. See State v. Hunt, 591 S.E.2d 502, 503 (N.C. 2003) ("[W]here a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." (quoting Mazda Motors of Am., Inc. v. Sw. Motors, Inc., 250 S.E.2d 250, 253 (N.C. 1979))).

Nor do other North Carolina courts appear to have interpreted the statute this way. Instead, when determining whether a prima facie case exists, North Carolina courts generally look for proof of more than a mere opportunity to misappropriate; they require evidence that the defendant

18

actually acquired or used trade secrets. See, e.g., Modular Techs., Inc. v. Modular Sols., Inc., 646 S.E.2d 864, at *4 (N.C. Ct. App. 2007) (unpublished) ("[E]ven assuming that at least some of the information to which [the employee] had access qualifies as trade secrets, plaintiff [employer] has not introduced substantial evidence that [the employee] acquired the information for disclosure or use, or disclosed or used the information."); Static Control Components, Inc. v. Summix, Inc., No. 1:08CV928, 2012 WL 1379380, at *7 (M.D.N.C. Apr. 20, 2012) (granting summary judgment to a defendant-competitor where the employer could show that an employee had access to its trade secrets but could not make the further showing that the employee shared them with the competitor); Amerigas Propane, L.P. v. Coffey, No. 14 CVS 376, 2015 WL 6093207, at *13 (N.C. Super. Ct. Oct. 15, 2015) (finding no prima facie case because the employer "has not offered evidence that [the employee] accessed or downloaded customer information from [the employer's] computer database in connection with his departure from the company"); cf. Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C., 620 S.E.2d 222, 229 (N.C. Ct. App. 2005) (holding that a prima facie case of misappropriation was established where a competitor hired employees from an employer and immediately expanded into the employer's territory, taking a large chunk of the employer's business); Byrd's Lawn & Landscaping, Inc. v. Smith, 542 S.E.2d

19

689, 693 (N.C. Ct. App. 2001) (finding that a prima facie case was established where an employee who had access to his employer's confidential cost-history information on customer contracts resigned and started a competing business that underbid the employer on several contracts). But see Barr-Mullin, Inc. v. Browning, 424 S.E.2d 226, 230 (N.C. Ct. App. 1993) ("[A] prima facie case of misappropriation exists since defendant Browning helped to develop the COMPU-RIP software during his employ with plaintiff and Browning had access to copies of the COMPU-RIP source code prior to his resignation.").

At least two potential interpretations of the statute would produce results consistent with those of the North Carolina courts, and we think the Supreme Court of North Carolina would adopt one of them.

## 1.

First, a more sensible—if less grammatically obvious—reading of the second prong of the prima facie case is available. As we have pointed out, the second prong of the prima facie case presents two alternate scenarios for a plaintiff to prove: Either the defendant "has had a specific opportunity to acquire [the trade secret] for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." § 66-155. The final phrase—"without the express or implied consent or

20

authority of the owner"—may be read to apply only to the second scenario; but one could also reasonably read it to apply to the first.

Thus, in the first scenario the plaintiff would have to show that the defendant "[h]as had a specific opportunity to acquire [the trade secret] for disclosure or use . . . without the express or implied consent or authority of the owner." Read this way, the employer would have to prove not merely that its employee had access to trade secrets, but also that the employee abused such access—the employer would have to show knowledge and an <u>unauthorized</u> opportunity to acquire or use trade secrets. Cf. Ridgway, 670 S.E.2d at 329 (finding a prima facie case where an employer proved that its employee accessed confidential files "with unusual frequency" shortly before attending a meeting with a competitor). Although this is perhaps not the most natural reading of the statute, it would avoid the problem outlined above and produce results consistent with decisions of North Carolina courts.

2.

Alternatively, a second interpretation would accept our original reading of the prima facie case, permitting an employer to show mere knowledge and opportunity. As we have noted, the grounds set out in the statute for rebutting the prima facie case do not assist an employee who wishes to rebut by arguing

21

that she never acquired or used any trade secrets at all. But because the statute does not expressly limit a defendant to these grounds for rebuttal—indeed, section 66-155 states that "[t]his section shall not be construed to deprive the person against whom relief is sought of any other defenses provided under the law"—we may infer the existence of another ground for rebuttal that would avoid the absurd result outlined above.

If a defendant's opportunity to steal trade secrets may give rise to an inference of misappropriation, we think the defendant rebuts the inference by showing that the circumstances surrounding the opportunity were not suspicious. In the employment context, if an employee can show that the opportunity was provided with the consent of the employer—as will often be the case—then an inference of misappropriation is no longer justified. The burden of production then shifts back to the employer to show evidence sufficient to raise an inference of actual acquisition or use. The practical effect of this burden shifting, of course, is that an employer accusing an employee of misappropriation will often gain little benefit from making a prima facie case based on opportunity. Instead, the framework will collapse into the question whether the employer has sufficient evidence of misappropriation to raise an inference of actual acquisition or use of its trade secrets. Here again,

this result is generally consistent with the practice of the North Carolina courts.

3.

To summarize: we conclude that the Supreme Court of North Carolina would adopt one of the two interpretations of section 66-155 we have discussed. Both produce a rule sufficient to resolve this case: When an employer brings a misappropriation claim against an employee, admitting that the employee had authorized access to its trade secrets at all relevant times, the employer must raise an inference of actual acquisition or use of trade secrets to survive summary judgment.

We note finally that this rule is consistent with the parties' views of the law, and that neither raised the meaning of section 66-155 as an issue in their briefs. See, e.g., Appellant's Br. at 17-18 (noting that Tuschen "had access to all of the documents and information," but arguing that RLM should have survived summary judgment because it had raised "a compelling circumstantial inference that a copy of the CD was taken by Tuschen and used by her and eScience"); Appellees' Br. at 19 (arguing that summary judgment was warranted because RLM could not raise an inference that Tuschen made an extra copy of the CD for herself or took the information stored on it).

C.

The rule we have just stated applies straightforwardly to this case. RLM admits it gave Tuschen access to its trade secrets, and it does not claim she ever accessed them without authorization. On either of our interpretations, these facts would prevent an inference of misappropriation from Tuschen's access alone: on the first, RLM fails to state a prima facie case, and on the second, though RLM states the prima facie case, Tuschen successfully rebuts it. RLM's burden, then, is to raise an inference of misappropriation, relying on circumstantial evidence if necessary. GE Betz, Inc. v. Conrad, 752 S.E.2d 634, 649 (N.C. Ct. App. 2013).

RLM has admitted "[it] doesn't have any" evidence "that Ms. Tuschen retained any of the information on the CD," J.A. 169, and we have already explained (in affirming the dismissal of RLM's claim that Tuschen breached the Confidentiality Agreement) why Tuschen's creation of the CD cannot raise an inference that she retained trade secrets.[4]

---

[4] RLM's reliance on Ridgway to urge a different result is misplaced. There, the employer put forth evidence that the employee "accessed [the employer's] 'game plan' and other confidential documents from [the employer's] network with unusual frequency" just prior to a meeting with a competitor. 670 S.E.2d at 329 (emphasis added). RLM has no comparable evidence that Tuschen's creation of the CD was suspicious.

24

Nevertheless, RLM contends that after hiring Tuschen, eScience underwent an "unexplained leap in technical capacity" that permits an inference of misappropriation. Appellant's Br. at 18. RLM cites Static Control Components, Inc. v. Darkprint Imaging, Inc., 200 F. Supp. 2d 541, 545-46 (M.D.N.C. 2002), which found "strong circumstantial evidence" of misappropriation where an aftermarket-toner distributor alleged that a competitor developed new toner product lines unusually quickly after hiring five of its employees. But unlike in Darkprint, where the evidence was undisputed that the competitor developed new products similar to the distributor's soon after hiring its employees, id., RLM's evidence fails to raise a genuine issue of fact as to whether eScience made a "leap in technical capacity." Its sole evidence is that eScience had never bid on the Contract before Tuschen joined, but afterward it was able to bid on the Follow-on Contract. We do not think submitting a bid, particularly an unsuccessful one, represents the same sort of "leap in technical capacity" described in Darkprint.[5]

---

[5] RLM also contends that, during discovery, Tuschen produced a document "virtually identical" to one on the CD. Appellant's Br. at 20. (RLM does not contend the document itself contains trade secrets.) But Tuschen testified she received the document from a third-party source and RLM has no evidence to suggest otherwise. While a fact finder could conclude that Tuschen acquired the document from RLM rather than the third-party, this would provide negligible evidence that she also acquired documents containing trade secrets.

D.

Because RLM has not produced sufficient evidence to permit an inference of misappropriation, summary judgment was properly granted on the trade-secrets claim.

VI.

RLM's conversion claim is easily dispatched based on the analysis above. In North Carolina, conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Peed v. Burleson's, Inc., 94 S.E.2d 351, 353 (N.C. 1956) (quoting 89 C.J.S., Trover & Conversion § 1). For the reasons set forth above, RLM's evidence does not make a genuine issue of its allegation that "Tuschen took RLM's confidential and proprietary information on a CD." Appellant's Br. at 23.

VII.

RLM next contests the district court's grant of summary judgment on its claim against eScience for tortious interference with contractual relations. The tort has four elements:

First, that a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person. Second, that the outsider had knowledge of the plaintiff's contract with the third person. Third, that the outsider intentionally induced the

26

third person not to perform his contract with the plaintiff. Fourth, that in so doing the outsider acted without justification. Fifth, that the outsider's act caused the plaintiff actual damages.

Peoples Sec. Life Ins. Co. v. Hooks, 367 S.E.2d 647, 649-50 (N.C. 1988) (quoting Childress v. Abeles, 84 S.E.2d 176, 181-82 (N.C. 1954)). In explaining the fourth prong, the Supreme Court of North Carolina has stated that "competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." Id. at 650 (holding that a competitor is not liable for tortious interference for hiring employees away from an employer and placing them in competition with the employer, so long as the competitor was motivated by competition rather than malice).

The district court correctly relied on Hooks, explaining that "[t]here is no genuine issue of fact that plaintiff and defendant [eScience] are competitors in the same field, and that [eScience] hired Tuschen to work on government contracts similar to those that she worked on with plaintiff." Tuschen, 66 F. Supp. 3d at 694. Because the record discloses no evidence that eScience was motivated by anything other than competition, its interference with Tuschen and RLM's employment contract was justified and summary judgment was therefore appropriate.

27

VIII.

RLM's remaining claims all rely in one way or another on claims we have already found meritless. First, RLM bases its claim for unfair and deceptive trade practices on its claims for misappropriation and tortious interference. See Appellant's Br. at 49-50. Because we have held that those claims lack merit, so does this one. Second, civil conspiracy requires "an underlying claim for unlawful conduct," Sellers v. Morton, 661 S.E.2d 915, 922 (N.C. Ct. App. 2008) (quoting Toomer v. Garrett, 574 S.E.2d 76, 92 (N.C. Ct. App. 2002)), and none remains. Finally, RLM's request for a permanent injunction is unwarranted because there is no basis on which to enjoin Tuschen or eScience.

IX.

For the foregoing reasons, we affirm the district court's judgment.

AFFIRMED