Am. Air Filter Co. v. Price, 2017 NCBC 9.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 13610

AMERICAN AIR FILTER COMPANY,
INC. d/b/a AAF INTERNATIONAL,
           Plaintiff,

           v.

SAMUEL C. PRICE, JR. and CAMFIL
USA, INC. d/b/a CAMFIL AMERICAS,
           Defendant.

)
)
)
)
)
)
)
)
)
)

**ORDER ON MOTION FOR
PRELIMINARY INJUNCTION**

THIS MATTER comes before the Court on Plaintiff's Motion for Preliminary Injunction ("Motion").

THE COURT, having considered the Motion, the briefs in support of and in opposition to the Motion, the arguments of counsel at the hearing, the record evidence filed by the parties, and other appropriate matters of record, FINDS and CONCLUDES, in its discretion, that the Motion should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

FACTUAL AND PROCEDURAL HISTORY[1]

1.     Plaintiff American Air Filter Company, Inc. (Plaintiff or "AAF") is a global manufacturer of clean air products and equipment. AAF offers a wide range of products such as air filters, dust collection equipment, and other filters and equipment for commercial buildings, data centers, healthcare facilities, food and

---

[1] The Court's factual findings are for purposes of deciding the Motion only, and are not binding in any subsequent proceedings. *Daimlerchrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 578, 561 S.E.2d 276, 282 (2002) (quoting *Kaplan v. Prolife Action League of Greensboro*, 111 N.C. App. 1, 16, 431 S.E.2d 828, 835 (1993)).

beverage establishments, and schools. AAF is headquartered in Louisville, Kentucky, and does business in North Carolina, including Wake County.

2.   Defendant Camfil USA, Inc. ("Camfil") is a direct competitor of AAF. Camfil also does business in North Carolina, including Wake County.

3.   Defendant Samuel C. Price, Jr. ("Price")[2] is a resident of Johnston County. AAF hired Price in the position of Branch Manager on or around December 11, 1989. (VFAC ¶ 28.)[3] Price was assigned to AAF's Raleigh, North Carolina branch. AAF later moved Price to the position of District Manager, but returned him to the position of Raleigh Branch Manager in 2001. Price was responsible for sales in various counties in the State of North Carolina, and after his return to the Branch Manager, for three national accounts based in South Carolina.

4.   AAF's "business is driven by relationships with its customers." (*Id.* ¶ 8.) AAF has made "significant investment[s] in developing and enhancing relationships" with its customers, and in "obtaining and compiling a substantial body of confidential and proprietary information and trade secrets . . . critical to its ability to serve existing and prospective" customers. (*Id.* ¶¶ 11–12.)

5.   AAF maintains web-based tools called "Sales Playbook" and "Salesforce.com" in which it compiles confidential and proprietary information used in its sales efforts. (*Id.* ¶¶ 15, 16, 18.) Sales Playbook and Salesforce.com are password

---

[2] Price and Camfil are referred to collectively as "Defendants."

[3] References to the allegations contained in the Verified First Amended Complaint, filed by Plaintiff on December 5, 2016, are denoted "VFAC."

protected. As an additional security measure, Sales Playbook cannot be downloaded or printed.

6. AAF also has a proprietary program called Total Cost of Ownership Diagnostics ("TCOD"). TCOD "provides technical data about AAF products and competitors' products based on AAF's internal and third-party testing and performance studies." (VFAC ¶ 17.). TCOD also calculates the costs of ownership of AAF's products as compared to competitors' products. TCOD is password protected.

7. Plaintiff alleges that "[t]he specific trade secrets accessible through these programs include," *inter alia*: "secret and highly sensitive company-wide prices that AAF corporate officers negotiated on behalf of AAF with its national accounts"; "quoting tools that use proprietary algorithms to create custom quotes that incorporate prices AAF negotiated with national accounts, AAF's custom discounts, and customer-specific needs"; "audit reports created by AAF sales professionals at the physical location of customer facilities which include identification of customers' current air filtration products, sizes, specifications, and customer-specific issues or talking points developed by AAF sales professionals"; "information on the costs of goods sold that could allow calculation of AAF profit margins"; "technical specifications and data that resulted from extensive internal and third-party product testing and performance studies"; and "detailed drawings and product specifications created by AAF for new customer construction projects." (*Id.* ¶ 18.)

8. "AAF developed its trade secrets through decades of data collection, research, and business development." (*Id.* ¶ 24.)

9. AAF disables employee access to its systems and trade secrets immediately upon an employee's notice of resignation or termination, or if the employee notifies AAF that they are going to work for a competitor.

10. Price "had access to and regularly relied on" AAF's trade secrets, and AAF provided Price with information available only to AAF "insiders." (*Id.* ¶¶ 35, 37.)

11. At the time AAF hired Price, and through 2006, AAF and Price executed several employment agreements. On November 13, 2006, AAF and Price executed a written "Sales Representative Employment Agreement" ("2006 Agreement"). (VFAC ¶ 43, Ex. B.) The 2006 Agreement expressly stated that it superseded the previous agreements. Plaintiff contends that in exchange for Price's commitments in the 2006 Agreement, AAF provided Price a 3.5% increase in salary and a "Sales Quota and Contribution Margin Target" that were "materially different" from Price's Sales Quota and Contribution Margin Target for 2005. (*Id.* ¶ 46.) Price contends that the salary increase was not provided as part of the 2006 Agreement, but instead was a "standard cost of living/merit increase" provided to all AAF employees. (Price 1st Aff. ¶ 20.) Price also claims he received no increased opportunity to earn commissions for 2007, and that he earned less compensation in 2007 than he had in 2006. Additionally, Defendants contend that any consideration provided to Price for the 2006 Agreement was illusory because the 2006 Agreement expressly reserved to AAF the right to unilaterally change the salary and commissions at any time.

12. The 2006 Agreement contained a non-competition clause that provided as follows:

> If the Employee terminates this Agreement or Company terminates this Agreement for cause, then in either event, for a period of one (1) year after such termination, Employee will not either on Employee's own behalf or on behalf of any other person, firm, corporation or other entity, either directly or indirectly, (a) contact, for the purpose of diverting, any of Company's customers or the Accounts; (b) solicit the trade of, or trade with any of Company's customers or the Accounts/Territory; (c) engage in any Competitive Business with the Accounts/Territory; (d) seek to cause any person, firm or corporation with whom the Employee came in contact as a representative or Company to refrain from doing business in whole or in part with or through Company; or (e) solicit or induce any employee, current or future, of Company, to leave Company or to work for another individual.

(VFAC ¶ 49; 2006 Agreement § 6.1.)

13. The 2006 Agreement was the final written employment agreement entered into between AAF and Price. Plaintiff alleges that the 2006 Agreement "automatically renewed for successive one-year periods" thereafter. (*Id.* ¶ 50.)

14. In 2016, Price decided to leave his employment with AAF because of frustrations with his level of compensation. (Price 1st Aff. ¶ 44.) Price discussed employment with Camfil in late July and early August, 2016. (Brunetti Aff. ¶ 5.) On July 24, 2016, a Camfil representative emailed to Price an offer of employment and a non-disclosure agreement. Plaintiff alleges "[u]pon information and belief, Price agreed as of July 24, 2016, to work for Camfil in the same capacity and for at least the same territory as he worked for AAF." (VFAC ¶ 54.) Despite filing multiple affidavits with the Court in opposition to the Motion, Defendants have alleged only that "Price did not accept the July 24, 2016 offer and discussions continued," but have

not provided the date on which Price accepted employment with Camfil. (Brunetti Aff. ¶ 5.) Price began employment with Camfil on August 15, 2016.

15. On August 5, 2016, Price sent an email to AAF management notifying them of his resignation effective August 12, 2016. Plaintiff alleges that Price told "senior AAF managers and others that he would be retiring from the air filtration industry and would not be joining a competitor."[4] (VFAC ¶ 52.) Price contends that he did not tell AAF management or co-workers that he was retiring. (Price 1st Aff. ¶ 45.)

16. Price did not inform AAF that he had accepted employment with Camfil. Plaintiff alleges that "[h]ad Price informed AAF that he would be working for Camfil, AAF would have discharged him on the spot," and "revoked Price's access to trade secrets immediately." (VFAC ¶ 56.) Plaintiff contends that Price's failure to inform AAF that he had accepted employment with Camfil render any authority or consent Price had to access its trade secrets "legally [in]effective." (*Id.* ¶ 59.) Plaintiff first learned that Price was working for Camfil in late August, 2016.

17. Price continued to work for AAF through August 12, 2016. With its reply brief filed on January 19, 2017, and at the hearing, Plaintiff provided to the Court documentation purporting to show that between July 24 and August 12, 2016, Price accessed the TCOD program, his AAF Microsoft Outlook program, and other allegedly

---

[4] Price's claim that he was retiring apparently would explain why AAF deviated from its alleged practice of immediately disabling access to its systems upon an employee's notice of resignation.

confidential information, and emailed or downloaded files to himself.[5] The documents did not reveal the specific files or data accessed by Price. Price contends that any access to AAF's systems that he made in the final weeks of his employment was to fulfill his job duties for AAF. He also claims that he accessed and downloaded from Microsoft Outlook only personal information and contacts. Price denies that he misappropriated any AAF trade secrets, and claims he has not shared any AAF trade secrets with Camfil. (Price 1st Aff. ¶ 49.)

18. It is undisputed that since going to work for Camfil, Price has contacted several AAF customers. Plaintiff alleges that Price contacted AAF customers "in an effort to divert their business from AAF to Camfil and damage AAF's goodwill with its customers." (VFAC ¶ 83.) Price claims that since joining Camfil he has "not made any sales to any AAF customer that I called on previously as an AAF employee." (Price 1st Aff. ¶ 46.) Camfil has directed Price not to solicit or sell to any AAF customer that he serviced while employed by AAF. (*Id.*; Brunetti Aff. ¶ 8.)[6] Plaintiff concedes that it has not lost any customers to Camfil, and that it does not have evidence that Price or Camfil has made a sale to any AAF customers.

19. Plaintiff filed the Complaint initiating this action on November 4, 2016, and filed the VFAC on December 5, 2016. The VFAC raises claims against Price for

---

[5] Plaintiff's counsel was unable to provide the Court with any compelling reasons for the delay in providing the documents or for Plaintiff's failure to provide a foundational affidavit for the documents. Nevertheless, the Court, in its discretion, will consider the documents for purposes of deciding the Motion.

[6] Despite Defendants' assurances, at the hearing Plaintiff's counsel provided the Court information indicating that Price has continued to contact his former AAF customers up to the time of the hearing.

breach of the 2006 Agreement and breach of fiduciary duty. The VFAC also raises claims against Defendants for tortious interference with contract, misappropriation of trade secrets in violation of the North Carolina Trade Secrets Protection Act, violation of the North Carolina Unfair and Deceptive Trade Practices Act, and civil conspiracy.

20.    Plaintiffs did not seek a temporary restraining order, but, instead, on December 9, 2016 filed the Motion, along with supporting affidavits and evidentiary materials. On January 6, 2017, Defendants filed a Response in Opposition to Motion for Preliminary Injunction, and on January 19, 2017, Plaintiff replied. On January 26, 2017, the Court held a hearing on the Motion. The Motion is now ripe for disposition.

DISCUSSION

21.    Plaintiff seeks an injunction prohibiting Price "from continuing to breach his Employment Agreement" and prohibiting Price and Camfil "from misappropriating AAF's valuable trade secrets and other confidential information." (Pl.'s Mot. Prelim. Inj. 1.)

22.    A preliminary injunction may be issued during litigation when "it appears by affidavit that a party thereto is doing or threatens or is about to do . . . some act . . . in violation of the rights of another party to the litigation respecting the subject of the action, and tending to render the judgment ineffectual." N.C. Gen. Stat. § 1-485(2) (hereinafter, references to the North Carolina General Statutes will be to "G.S."). A preliminary injunction is "an extraordinary remedy and will not be lightly

granted." *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 692, 228 S.E.2d 478, 483 (1976). The movant bears the burden of establishing the right to a preliminary injunction. *Pruitt v. Williams*, 288 N.C. 368, 372, 218 S.E.2d 348, 351 (1975). To obtain a preliminary injunction a movant must show "a likelihood of success on the merits of his case and . . . [that the movant] is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of his rights during the course of litigation." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 466, 579 S.E.2d 449, 452 (2003); *accord Looney v. Wilson*, 97 N.C. App. 304, 307–08, 388 S.E.2d 142, 144–45 (1990). Likelihood of success means a "reasonable likelihood." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 404, 302 S.E.2d. 754, 761 (1983).

23. In addition, the Court must balance the equities, and a preliminary injunction "should not be granted where there is a serious question as to the right of the defendant to engage in the activity and to forbid the defendant to do so, pending the final determination of the matter, would cause the defendant greater damage than the plaintiff would sustain from the continuance of the activity while the litigation is pending." *Bd. of Provincial Elders v. Jones*, 273 N.C. 174, 182, 159 S.E.2d 545, 551–52 (1968); *accord Cty. of Johnston v. City of Wilson*, 136 N.C. App 775, 780, 525 S.E.2d 826, 829 (2000) (noting that a court should weigh "the advantages and disadvantages to the parties" in deciding whether to issue a preliminary injunction). The issuance of an injunction is "a matter of discretion to be exercised by

the hearing judge after a careful balancing of the equities." *State ex rel. Edmisten v. Fayetteville St. Christian Sch.*, 299 N.C. 351, 357, 261 S.E.2d 908, 913 (1980).

24. In support of the Motion, AAF has argued the likelihood of success of its claims for breach of the 2006 Agreement and misappropriation of trade secrets, and the Court will address only these claims.

I. *Breach of 2006 Agreement.*

a. Likelihood of Success.

25. Preliminarily, the parties dispute whether the question of the 2006 Agreement's enforceability should be decided under the law of Kentucky or North Carolina.[7] Plaintiff urges the Court to honor the choice of law provision in the 2006 Agreement and apply Kentucky law.[8] (Pl.'s Br. Supp. Mot. Prelim. Inj. 12) Defendants contend that the Court should apply North Carolina law because "Kentucky law on restrictive covenants conflicts with North Carolina law and public policy," and because North Carolina has the greater interest in the subject matter of this dispute (Defs.' Resp. Opp. Mot. Prelim. Inj. 6–7.)

26. The Court, however, need not determine the appropriate law to be applied in this case because even if Plaintiff could establish likelihood of success

---

[7] There is a material difference in the standards applied by the two states in determining the enforceability of covenants not to compete. *Compare Charles T. Creech, Inc. v. Brown*, No. 2011-CA-000629-MR, 2012 Ky. App. Unpub. LEXIS 1033, at *13–14 (Ky. Ct. App. Aug. 17, 2012), *rev'd on other grounds*, 433 S.W.3d 345 (2014) (outlining requirements for enforceability of a non-compete agreement under Kentucky law) *with Hartman v. W.H. Odell & Assocs.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994) (providing requirements for enforceability of a non-compete agreement under North Carolina law).

[8] Section 7.2 of the 2006 Agreement provides "[t[he construction performance and completion of this Agreement shall be governed by the laws of the State of Kentucky."

under either state's law, it has failed to establish that it will suffer irreparable harm if an injunction enforcing the non-compete provision is not issued.

b. Irreparable Harm.

27. "A prohibitory preliminary injunction is granted only when irreparable injury is real and *immediate*." *United Tel. Co. v. Universal Plastics, Inc.*, 287 N.C. 232, 235, 214 S.E.2d 49, 51 (1975) (emphasis added). "An applicant for a preliminary injunction must do more than merely allege that irreparable injury will occur. The applicant is required to set out with particularity facts supporting such statements so the court can decide for itself if irreparable injury will occur." *Id.*

28. The request for a preliminary injunction in this case arises under circumstances which establish that Plaintiff has not suffered any harm almost six months after Price allegedly violated the non-competition covenant by accepting employment with Camfil. Plaintiff concedes that it has no evidence that Price has solicited away any AAF customers or that any AAF customers have ceased doing business with AAF and are now customers of Camfil. Plaintiff also has not presented evidence that there is a real and immediate danger of Price soliciting away any of AAF's customers.

29. It also is significant that Plaintiff learned Price was employed with Camfil in late August, 2016, but did not file this action until November, 2016, did not seek a TRO to enforce the non-competition covenant, and did not move for a preliminary injunction until December 9, 2016. Plaintiff's lack of urgency in seeking injunctive relief counsels against the idea that it is likely to suffer irreparable harm.

*See N. Iredell Neighbors for Rural Life v. Iredell Cty.*, 196 N.C. App. 68, 79, 674 S.E.2d 436, 443 (2009) (affirming trial court's finding of no irreparable harm where "some two months elapsed without any contention by plaintiffs of an urgent threat of irreparable harm and after having reviewed the standards set forth in both the federal and North Carolina cases"); *Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 420 (E.D.N.C. 2006) (applying North Carolina law) ("[T]he six to nine week delay between plaintiff's discovery of defendant's competitive activities and its filing suit weighs against injunctive relief.").

30.    The primary purpose of non-competition covenants is to protect the employer's customers and associated goodwill with those customers. *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 651, 370 S.E.2d 375, 381 (1988) ("[P]rotection of customer relationships and goodwill against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer."). The evidence establishes that Plaintiff has not lost, and is not likely to suffer an immediate loss of, customers from Price's alleged breach of the non-competition covenant.

31.    Accordingly, Plaintiff has failed to show that it is likely to sustain irreparable harm unless an injunction is issued prohibiting Price from breaching or continuing to breach the terms of the 2006 Agreement, and enforcing the 2006 Agreement.

32.    The Court concludes, in its discretion, that Plaintiff's Motion for Preliminary Injunction prohibiting Price from breaching or continuing to breach the

terms of the 2006 Agreement, and seeking enforcement of the 2006 Agreement, should be DENIED.

## II. *Misappropriation of Trade Secrets.*

### a. Likelihood of Success.

33. Under the North Carolina Trade Secrets Protection Act (NCTSPA), "misappropriation" is defined as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." G.S. § 66-152(1). A "trade secret" is "business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that: (a) Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." G.S. § 66-152(3).

34. Defendants first argue that Plaintiff has not identified its trade secrets with sufficient specificity to support a claim for misappropriation under the NCTSPA. (Defs.' Resp. Opp. Mot. Prelim. Inj. 20-22.) Defendant contends that Plaintiff identifies only "generalized categories of information." (*Id.* 21.) This argument is without merit. Plaintiff provided evidence that the TCOD is a proprietary program developed by AAF that contains data regarding AAF's and its competitor's products

compiled, in part, through AAF's own internal testing and performance studies. The program calculates the costs of ownership of AAF's products as compared to its competitor's products based on the customer's operating parameters. (*Id.* ¶ 17.) Plaintiff also presented evidence that the trade secrets at issue in this matter included, *inter alia*, information about prices AAF negotiated with its national accounts, tools that use proprietary algorithms to create custom quotes, reports created by AAF at its customers' facilities which include identification of customers' current air filtration products, sizes, specifications, and other customer-specific issues, AAF's costs of goods sold from which AAF's profit margins can be determined, and detailed drawings and product specifications created by AAF for customers. (*Id.* ¶ 18.) This description of the information at issue satisfies Plaintiff's obligations to identify its trade secrets.

35. A prima facie case of misappropriation is established by introducing "substantial evidence" that the defendant: "(1) knows or should have known of the trade secret; and (2) has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." G.S. § 66-155. A prima facie case of misappropriation may be established by circumstantial evidence. *TSG Finishing, LLC v. Bollinger*, 238 N.C. App. 586, 595, 767 S.E.2d 870, 878 (2014).

36. The Act also provides that "actual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action." G.S. §

66-154; *Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 568–69, 754 S.E.2d 852, 859 (2014).

37. Plaintiff alleges Price misappropriated AAF's trade secrets by, among other actions, accessing Plaintiff's confidential databases and by repeatedly accessing and downloading files from his Microsoft Outlook program, following Price's receipt of the offer of employment from Camfil. Plaintiff contends that Price's access to the trade secrets was without authorization because he accessed the information after accepting employment with Camfil.

38. It is undisputed that Price knew or should have known of the trade secrets. Accordingly, Plaintiff's likelihood of success turns on whether there is sufficient evidence to satisfy the second "prong" of G.S. § 66-155; did Price have opportunity to acquire the trade secrets or actually acquire, use, or disclose the trade secrets without the consent of AAF?

39. The evidence establishes, and Defendants do not dispute, that Price had opportunity to acquire AAF's trade secrets. Defendants argue, however, that a preliminary injunction should issue only "where actual misappropriation is demonstrated." (Defs.' Resp. Opp. Mot. Prelim. Inj. 22, quoting *Allegis Grp., Inc. v. Zachary Piper LLC*, 2013 NCBC LEXIS 12, *27 (N.C. Super. Ct. 2013).) Defendants contend that Plaintiff has not presented evidence "*that Price actually took anything.*" (*Id.* at 24; emphasis in original.)

40. North Carolina, however, has expressly rejected the contention that evidence of actual misappropriation is required to obtain injunctive relief under the

TSPA. *Horner*, 232 N.C. App. at 568–70, 754 S.E.2d at 859–60. In *Horner*, the defendant argued that the trial court erroneously issued a preliminary injunction prohibiting the defendant from disclosing trades secrets because plaintiff established only the "opportunity for misappropriation." *Id.* at 568, 754 S.E.2d at 859. The Court of Appeals rejected this argument, holding:

> Defendant's strenuous assertions on appeal that Plaintiff produced no direct or circumstantial evidence of his "acquisition, use, or disclosure of [Plaintiff's] information" is misplaced. The TSPA permits preliminary injunctions where a *prima facie* case for "actual or *threatened* misappropriation of a trade secret" is established. N.C. Gen. Stat. § 66-154(a) (emphasis added). . . . Defendant's knowledge of trade secrets and opportunity to use those in his work for his new employer create a threat of misappropriation, and thus the trial court's grant of a preliminary injunction during the pendency of the action was proper.

*Id.* at 569–70, 754 S.E.2d at 859–60. Accordingly, Plaintiff is not required to establish actual misappropriation to obtain an injunction.

41.     Defendants further argue that even if opportunity to acquire trade secrets, by itself, is sufficient to raise a prima facie case of misappropriation, the prima facie showing is rebutted by Defendants "by showing that the employer granted access to the trade secrets or that circumstances surrounding any accesses were not suspicious." (Defs.' Resp. Opp. Mot. Prelim. Inj. 22–23.). In support, Defendants rely on the Fourth Circuit Court of Appeals' recent decision in *RLM Communications, Inc. v. Tuschen*, 831 F.3d 190 (4th Cir. 2016).

42.     In *RLM*, the Fourth Circuit considered the evidentiary standard for establishing a prima facie case under G.S. § 66-155 in the context of reviewing the

district court's order granting summary judgment. The Court noted that if a plaintiff satisfied the first "prong" of the statute, that defendant knew of the trade secrets, "[a]t first blush, [the] second prong appears to allow a plaintiff to show <u>either</u> that the defendant had an opportunity to acquire trade secrets <u>or</u> that the defendant in fact acquired them without permission." 831 F.3d. at 199 (emphasis in original). The Court opined that such an interpretation was problematic because:

> In the employment context, if knowledge and opportunity suffice for a prima facie case of misappropriation, then an employer can state a prima facie case against its employee merely by showing that it gave the employee access to its trade secrets. The employer can therefore force such an employee to go to trial on a misappropriation claim—unless the employee can rebut the prima facie case. Unfortunately, the statute does not clearly address rebuttal in a case such as this one, where the employee claims that she never acquired or used trade secrets at all. The statute provides three grounds for rebutting the prima facie evidence, but all grounds assume that the employee has in fact acquired the trade secrets: "prima facie evidence is rebutted by the introduction of substantial evidence that the person against whom relief is sought acquired the information comprising the trade secret by independent development, reverse engineering, or it was obtained from another person with a right to disclose the trade secret." If these grounds were exclusive, an absurd result would follow: Every employee in North Carolina who had access to her employer's trade secrets but did not acquire them would have to go to trial to fend off the employer's claim of misappropriation.

*Id.* at 200–01.

43.     The Fourth Circuit concluded that the North Carolina Supreme Court would "not adopt such an interpretation" of G.S. § 66-155. *Id.* at 201. Instead, after reviewing existing North Carolina case law on the question, the Court held that the

Supreme Court would adopt one of two interpretations. The first would require that to establish a prima facie case of misappropriation "the employer . . . prove not merely that its employee had access to trade secrets, but also that the employee abused such access—the employer would have to show knowledge and an <u>unauthorized</u> opportunity to acquire or use trade secrets." *Id.* (emphasis in original).

44.     The Fourth Circuit held that a second potential interpretation of G.S. § 66-155 would permit the plaintiff to establish a prima facie case by showing "mere knowledge and opportunity" to acquire the trade secret, which would "give rise to an inference of misappropriation." *Id.* The defendant could rebut "the inference by showing that the circumstances surrounding the opportunity were not suspicious," including by showing that "the opportunity was provided with consent." *Id.* at 201–02.[9] The Court concluded, however, that:

> The practical effect of this burden shifting, of course, is that an employer accusing an employee of misappropriation will often gain little benefit from making a prima facie case based on opportunity. Instead, the framework will collapse into the question whether the employer has sufficient evidence of misappropriation to raise an inference of actual acquisition or use of its trade secrets. Here again, this result is generally consistent with the practice of the North Carolina courts.

*Id.* at 202.

---

[9] The Fourth Circuit's conclusion in this regard is consistent with the conclusion reached in *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2002 NCBC LEXIS 2, *43 (N.C. Super. Ct. 2002) ("There is no specific requirement that plaintiff show that defendants have disclosed or used the trade secrets, only that they had a specific opportunity to acquire the trade secrets for use or disclosure. Once plaintiff establishes a *prima facie* case, the burden shifts to defendants to show that the trade secret was not acquired improperly.").

45. The Court finds the Fourth Circuit's reasoning and conclusion in *RLM* compelling. Evidence that a former employee had access to, and therefore an "opportunity to acquire," an employer's trade secrets, without more, is not sufficient to establish a prima facie case of misappropriation. Rather, the employer must establish either that the former employee accessed its trade secrets without authorization or provide other sufficient evidence of misappropriation to raise an inference of *actual* acquisition or use of its trade secrets.

46. Applying this burden, the Court concludes that Plaintiff has produced sufficient evidence to establish a prima facie case of misappropriation. The evidence shows that Camfil is one of AAF's direct and major competitors, and that Price is now working for Camfil. Price's primary responsibility with AAF and Camfil are the same—sales. Price admitted that he has contacted several of his former AAF customers since becoming employed with Camfil, and apparently may still be contacting AAF customers despite Defendants promises that he would not do so. *TSG Finishing*, 238 N.C. App. at 595, 767 S.E.2d at 878 (holding that "plaintiff demonstrated a likelihood of success on the merits of his claim for trade secret misappropriation" where defendant former-employee was performing "similar duties" and working for "share[d] customers" with a direct competitor.").

47. More significantly, Camfil extended Price a job offer on July 24, 2016, and Price continued to work for AAF and accessed its systems containing AAF's confidential and proprietary information, until August 12, 2016. Between July 24 and August 12, 2016, Price accessed the TCOD program, his AAF Microsoft Outlook

program, and other allegedly confidential information, and emailed or downloaded files to himself. Defendants contend that Price did not accept employment with Camfil on July 24, 2016, but has failed to provide the date on which Price did accept employment.

48. In addition, Price did not inform AAF that he was going to work for Camfil when he notified AAF of his resignation on August 5, 2016. Had he done so, AAF would have immediately terminated Price's employment and his access to its trade secrets. Under these circumstances, the Court concludes that Plaintiff has made a sufficient showing to raise an inference that Price's access to its trade secrets after July 24, 2016 was not authorized. *Barker Indus. v. Gould*, 146 N.C. App. 561, 565–66, 553 S.E.2d 227, 230 (2001) ("[B]road injunctive relief is available where there has been some showing of bad faith or underhanded dealings on the part of the party to be enjoined.").

49. Finally, the evidence in the record at this juncture supports the conclusion that Price is performing the same type of sales duties he performed for AAF, and that there is a threat that Price could use AAF's trade secrets in his employment with Camfil. This supports issuance of the requested injunction. *Horner*, 232 N.C. App. at 570, 754 S.E.2d at 860.

50. The Court concludes that Plaintiff has established a likelihood of success on its claim for misappropriation of trade secrets.

b. <u>Irreparable Harm.</u>

51. The Court also concludes that the Plaintiff has shown that it is likely suffer irreparable harm if the preliminary injunction does not issue. The acquisition and potential disclosure or use of the information in Plaintiff's confidential databases, which contain extensive data collected by Plaintiff from its customers and proprietary costing formulas, would cause irreparable harm to the Plaintiff.

52. Finally, balancing the relative burdens on the parties, it is clear that Defendants will suffer little harm from being enjoined from misappropriating Plaintiff's trade secrets during the course of this action. Defendants have submitted affidavits to this Court stating that they have not acquired or used Plaintiff's trade secret information. Accordingly, an injunction prohibiting such conduct will have little impact on Defendants.

53. On these grounds, and balancing the equities here, the Court concludes, in its discretion, that Plaintiff's Motion for Preliminary Injunction prohibiting Defendants from misappropriating AAF's trade secrets should be GRANTED.

54. Before a preliminary injunction will issue, a bond must be posted "in such sum as the judge deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined." G.S. § 1A-1, Rule 65(c). "Since the purpose of the security requirement is to protect the restrained party from damages incurred as a result of the wrongful issuance of the injunctive relief, the trial court has the discretion to determine what amount of security, if any, is necessary to protect the enjoined party's interests." *Barr-Mullin, Inc. v. Browning*, 108 N.C. App. 590, 598, 424 S.E.2d 226, 231 (1993) (citing

*Keith v. Day*, 60 N.C. App. 559, 561, 299 S.E.2d 296, 297 (1983)). In its discretion and in consideration of the likelihood of material damage and harm to the Defendants if wrongfully enjoined, the Court requires Plaintiff to post a bond of $100.00.

THEREFORE, IT IS ORDERED that:

1.    The Motion is DENIED, in part, and GRANTED, in part. The Motion is DENIED as to the request for an injunction prohibiting Price from breaching or continuing to breach the terms of the 2006 Agreement, and to the extent it seeks enforcement of the 2006 Agreement.

2.    The Motion is GRANTED as to the request for an injunction prohibiting Defendants from misappropriating AAF's trade secrets. Accordingly, Samuel C. Price, Jr. and Camfil USA, Inc. d/b/a Camfil Americas ("Defendants") are IMMEDIATELY ENJOINED and PROHIBITED, directly or indirectly, alone or in concert with others, from disclosing the trade secrets of American Air Filter Company, Inc. d/b/a AAF International ("AAF"), including information maintained by AAF in the Sales Playbook, Salesforce.com, and TCOD systems, and including, but not limited to:

a.    pricing information per customer, including the secret and highly sensitive company-wide prices that AAF corporate officers negotiated on behalf of AAF with its national accounts;

b.    price sheets containing current and historic prices for each of AAF's products, which could be broken down further by part number, box quantity, and box rate;

c.     quoting tools that use proprietary algorithms to create custom quotes that incorporate prices AAF negotiated with national accounts, AAF's custom discounts, and customer-specific needs;

d.     daily, monthly, and quarterly sale projections that could be broken down by custom geographic territories;

e.     audit reports created by AAF sales professionals at the physical location of customer facilities which include identification of customers' current air filtration products, sizes, specifications, and customer-specific issues or talking points developed by AAF sales professionals;

f.     detailed spreadsheets identifying potential customers and projects, including contact information for leads (names, phone numbers, and email addresses) in addition to AAF's sales professionals' personal notes on previous sales calls and the historic quotes AAF offered to potential customers;

g.     information on the costs of goods sold that could allow calculation of AAF profit margins;

h.     technical specifications and data that resulted from extensive internal and third-party product testing and performance studies; and

i.      detailed drawings and product specifications created by AAF for new customer construction projects.

3.     On or before 5:00 pm on February 10, 2017, Plaintiff shall post a bond of $100.00 in a form satisfactory to the Clerk of Superior Court of Wake County. If

Plaintiff fails to post the required bond by 5:00 pm on February 10, 2017, the injunction shall dissolve immediately.

4.    Except as specifically granted herein, the Motion is DENIED.

SO ORDERED, this the 3rd day of February, 2017.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
  for Complex Business Cases