IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA17-32

Filed: 18 July 2017

Wake County, No. 15 CVS 7979

FRIENDS OF CROOKED CREEK, L.L.C.; MARK BERTRAND; DONNA BERTRAND; SYLVIA T. TERRY; ROBERT F. ZAHN; and MICHELLE R. ZAHN, Plaintiffs,

v.

C.C. PARTNERS, INC. and CROOKED CREEK GOLF LAND LLC, Defendants.

Appeal by plaintiffs from order entered 5 August 2016 by Judge G. Wayne Abernathy in Wake County Superior Court. Heard in the Court of Appeals 15 May 2017.

*Law Offices of F. Bryan Brice, Jr., by Matthew D. Quinn, for plaintiff-appellants.*

*Parker Poe Adams & Bernstein LLP, by Russell B. Killen, Jamie S. Schwedler and Michael J. Crook, for defendant-appellees.*

TYSON, Judge.

Friends of Crooked Creek, L.L.C., Mark and Donna Bertrand, Sylvia T. Terry, and Robert F. and Michelle R. Zahn ("Plaintiffs") appeal from an order denying their motion for summary judgment and granting summary judgment in favor of Defendants. We affirm.

I. Background

In 1992, C.C. Partners, Inc. ("C.C. Partners") purchased a tract of real property situated in Fuquay-Varina, North Carolina and sub-divided portions of the property into single-family residential lots. C.C. Partners intended for the Crooked Creek subdivision to be developed as a golf course community, and retained a portion of the property to construct a golf course. C.C. Partners did not dedicate or convey the un-subdivided areas to the lot owners or the homeowner's association, or designate the areas as common area.

In 1992 and 1993, C.C. Partners recorded two plats of the subdivision, which showed the creation of residential lots. Although the construction of a golf course was contemplated by C.C. Partners on its retained property, neither of these plats depicts a golf course. The plats did not set forth any indication that the property retained by C.C. Partners was to be restricted to a golf course, or a perpetual amenity or common area for the benefit of the lot owners. The plats depict golf-themed street names, such as "Tee Box Court" and "Shady Greens Drive."

The 1992 plat contains Note 6, which states and reserves: "Lots fronting golf course shall allow limited access to property to retrieve golf balls and or complete maintenance as required to facilitate play by golfers . . . ." The plat recorded in 1993 contains Note 6 and a new Note 5, which states and reserves: "Golf course owner and developer reserve the right to encroach upon any lot for 10' on all sides if necessary for utility easement and irrigation system."

In 1993, C.C. Partners recorded a Declaration of Covenants, Conditions and Restrictions for Crooked Creek Subdivision ("the Declaration"). The Declaration makes several references to a proposed golf course, which are set forth and discussed *infra*.

In 1994, C.C. Partners recorded plats showing the creation of additional residential lots. None of these plats depict or label any area for a golf course, or contain any indication that the retained property was to be a perpetual amenity or common area to either benefit the lot owners or be maintained by C.C. Partners. The plats include Notes 5 and 6, as stated above, as well as new Note 11, which states and reserves: "Lots fronting golf course shall allow golf course encroachment up to 50 feet from rear or side lot lines to facilitate golf course construction and play." The subsequent plats also contain these Notes, although their designated numbers vary from plat to plat.

From 1992 to March 1995, C.C. Partners sold lots to builders, who sold the lots to homeowners. C.C. Partners began construction of a golf course on a portion of the original tract in 1993.

C.C. Partners and subsequent developers heavily marketed the subdivision as a "golf course community" with an "18-hole golf course." For example, a marketing brochure stated the "[i]nitiation fee for membership in the Crooked Creek Golf Club will be waived for the first 20 home buyers in Crooked Creek."

In December 1994, C.C. Partners entered into a contract to sell undeveloped portions of the Crooked Creek subdivision to MacGregor Development Company ("MacGregor"), a party unrelated to this lawsuit. The property to be conveyed consisted of twenty-four previously subdivided residential lots and five un-subdivided tracts of land.

In preparation for the closing, C.C. Partners had a survey completed to reflect the property to be sold to MacGregor. The owners of C.C. Partners testified by affidavit that the purpose of this survey plat was to provide a legal description of the property to be sold to MacGregor.

In February 1995, C.C. Partners recorded a plat entitled "Map of Crooked Creek Golf Course and Subdivision," which depicts a dash-lined sketch of an 18-hole golf course, tee boxes, fairways and greens, a driving range, the clubhouse, and other golf features. The plat also depicts five bold or hard-lined boundary acreage tracts, labeled "A," "B," "C," "D" and "F."

Tracts A, B, C, D and F were conveyed to MacGregor in March 1995, and MacGregor became the developer of further residential lots in Crooked Creek. C.C. Partners remained the owner and developer of the golf course. Construction of the golf course and clubhouse was completed after the conveyance to MacGregor in March 1995.

The deed from C.C. Partners to MacGregor references the 1995 plat, which depicts the dash-lined outline of the golf course and adjoining properties. The deed does not include any use restrictions on the property retained by C.C. Partners.

MacGregor began to subdivide tracts A, B, C, D and F to create new residential lots and sold the lots to buyers. MacGregor was solely responsible for the marketing and sale of the lots in Crooked Creek. However, according to the deposition of C.C. Partners' plurality shareholder, C.C. Partners and MacGregor were "trying to work together . . . to sell golf and sell lots" in the years that followed the transfer of the residential lots to MacGregor.

For example, an area inside the golf clubhouse featured advertisements and a sales center for homes for sale within Crooked Creek. Advertisements for homes for sale referenced the golf course, and promoted "golf course homesites." Around 2005, C.C. Partners issued a flyer that offered a $1,000.00 discount on golf club initiation fees "to Crooked Creek Homeowners."

Crooked Creek Residential Properties, LLC recorded several plat maps subsequent to C.C. Partners' 1995 conveyance of tracts A, B, C, D and F. Those maps depict subdivision of the tracts purchased by MacGregor, and show land abutting residential lots labeled "Portion of Crooked Creek Golf Course."

On 31 December 2002, C.C. Partners transferred approximately one-half of the golf course property to Crooked Creek Golf Land, LLC ("CCGL"). No taxable

consideration was stated and no revenue stamps were paid for the transfer of the property. The transaction was solely designed to facilitate a conservation easement. Statements averred C.C. Partners and CCGL are "one and the same."

Crooked Creek Golf Club experienced financial hardships during the recession beginning in 2008, and did not fully recover. C.C. Partners thereafter publically announced its intention to close the golf course and subdivide the golf course property into residential lots. The Crooked Creek Golf Club closed permanently on 5 July 2015, sold most of its assets, and has not maintained the property as a golf course since that time. C.C. Partners and CCGL have entered into a contract to sell twenty-one acres of the property to the Wake County Public School System.

Plaintiff, Friends of Crooked Creek, LLC ("FOCC"), is a limited liability company formed in 2014, whose membership consists entirely of Crooked Creek lot owners. FOCC's stated goal is to preserve the beauty, value, and livability of Crooked Creek. None of FOCC's seventy-eight members' deeds reference the 1995 plat, which shows the dotted outline of a golf course.

Plaintiffs filed suit on 15 June 2015, and sought a declaratory judgment to declare the golf course property is subject to the Declaration, which restricts the property to golf related uses. Plaintiffs also sought injunctive relief to prevent the closure of the golf course and development of the golf course property into residential lots, which the trial court denied on 2 July 2015.

Defendants filed a motion for summary judgment on 22 February 2016, and Plaintiffs filed a motion for summary judgment on 15 March 2016. By Order filed 5 August 2016, the trial court denied Plaintiffs' motion for summary judgment and granted summary judgment in favor of Defendants on all issues. Plaintiffs appeal.

## II. Jurisdiction

Jurisdiction lies in this Court from final judgment of the superior court pursuant to N.C. Gen. Stat. § 7A-27(b) (2015).

## III. Whether the Property is Burdened by a Golf Only Use

Plaintiffs argue the trial court erred by granting summary judgment in favor of Defendants and denying their motion for summary judgment where: (1) C.C. Partners burdened the golf course property with a Declaration that promised the golf course would be used only for golf related purposes; and, (2) C.C. Partners' plat maps and community promotions imposed an easement-by-plat that the golf course property would be used only for golf related purposes in perpetuity.

## A. Standard of Review

> Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party. If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmovant to present specific facts which establish the

presence of a genuine factual dispute for trial. Nevertheless, if there is any question as to the weight of evidence summary judgment should be denied.

*In re Will of Jones*, 362 N.C. 569, 573-74, 669 S.E.2d 572, 576-77 (2008) (internal citations, quotation marks, and brackets omitted).

## B. The Declaration

Plaintiffs argue the property developed as a golf course is burdened by the Declaration and its restrictive covenants, which promised the Crooked Creek lot owners that the property would be developed as a golf course and used only for golf. We disagree.

"In construing restrictive covenants, the fundamental rule is that the intention of the parties governs, and that their intention must be gathered from study and consideration of all the covenants contained in the instrument or instruments creating the restrictions." *Long v. Branham*, 271 N.C. 264, 268, 156 S.E.2d 235, 238 (1967).

> Covenants and agreements restricting the free use of property are *strictly construed against limitations upon such use*. Such restrictions will not be aided or extended by implication or enlarged by construction to affect lands not specifically described, *or to grant rights to persons in whose favor it is not clearly shown such restrictions are to apply. Doubt will be resolved in favor of the unrestricted use of property, so that where the language of a restrictive covenant is capable of two constructions, the one that limits, rather than the one which extends it, should be adopted, and that construction should be embraced which least restricts the free use of the land.*

> Such construction in favor of the unrestricted use, however, must be reasonable. The strict rule of construction as to restrictions should not be applied in such a way as to defeat the plain and obvious purposes of a restriction.

*Id*. (citation and quotation marks omitted) (emphasis supplied).

"Restrictive covenants cannot be established except by a[n] instrument of record containing adequate words so unequivocally evincing the party's intention to limit the free use of the land that its ascertainment is not dependent on inference, implication or doubtful construction." *Marrone v. Long*, 7 N.C. App. 451, 454, 173 S.E.2d 21, 23 (1970) (citing *Turner v. Glenn*, 220 N.C. 620, 18 S.E.2d 197 (1942)). "'The courts are not inclined to put restrictions in deeds where the parties left them out.'" *Id*. (quoting *Hege v. Sellers*, 241 N.C. 240, 249, 84 S.E.2d 892, 899 (1954)).

The Declaration, which was recorded by C.C. Partners in 1993, references a golf course. The "golf course" is defined under the Declaration as "the Crooked Creek golf course (or to such other name given to same), including all related and appurtenant facilities thereto . . . ., which Declarant *contemplates* developing out of a portion of the Property or out of other real property adjoining or located near the Property." (emphasis supplied).

Plaintiffs argue the Declaration imposed a covenant that the subdivision would contain a golf course. Plaintiffs assert this enforceable, express covenant is set forth in Article XII, Section 15 of the Declaration, which states:

> Declarant hereby informs all Owners of the Lots subject to this Declaration . . . that the lots subject to this Declaration *are part of a subdivision plan approved by Wake County, North Carolina, which approved subdivision plan contains a golf course and related facilities (previously defined hereinabove as the "Golf Course").* Declarant hereby informs all Owners of Lots in the Subdivision that certain provisions of this Declaration have been written for the purpose of enhancing the use and value of the Golf Course and to protect the rights of the owners of the Golf Course and those Persons lawfully using the Golf Course.

> Declarant hereby further informs all such Owners . . . that there exists certain hazards or risks associated with the ownership and use of property located adjacent to or near a Golf Course, . . . and Declarant hereby reserves for the owners of the Golf Course . . . a perpetual, non-exclusive easement to enter onto Lots in the Subdivision for the purpose of retrieving golf balls . . . . (emphasis supplied).

Section 15 is clearly a hazard and risks disclosure clause to lot owners, a reservation for golfers to enter on to lots to retrieve balls, and is not a use restriction, covenant or easement conveyed to lot owners. The hazard clause incorporates the definition of "golf course" under the Declaration, which merely refers to a "contemplated" golf course.

We decline to interpret this clause to impose a perpetual burden on the property, where a burden was not plainly contemplated. *See Marrone*, 7 N.C. App. at 454, 173 S.E.2d at 23. "[N]othing can be read into a restrictive covenant enlarging its meaning beyond what its language plainly and unmistakably imports." *Julian v. Lawton*, 240 N.C. 436, 440, 82 S.E.2d 210, 212 (1954) (citation omitted).

Furthermore, "[r]estrictions will not be aided or extended by implication or enlarged by construction to affect lands *not specifically described*, or to grant rights to persons in whose favor it is not clearly shown such restrictions are to apply." *Long*, 271 N.C. at 268, 156 S.E.2d at 239. The hazard clause does not describe a specific, required use or restriction on the retained property, or sufficiently describe any property to be bound to perpetual restrictions.

Plaintiff's proffered interpretation of the hazard clause also runs contrary to other unambiguous provisions of the Declaration. The Declaration further provides:

> The Golf Course property also shall be exempt from the assessments and liens for same created herein. Provided, however, *if at any time in the future any part or all of the Golf Course property shall be subdivided into Lots intended for single-family residential use or used for multi-family residential purposes*, then the exemption from assessments and liens for such part or all of the Golf Course property shall terminate and the same shall become subject to assessments and liens as provided herein for Lots and multi-family residential property. (emphasis supplied).

This clause plainly states the retained property may not always be used as a golf course, and the "Golf Course property" could later be developed into lots or other uses. The Declaration also includes an express right of access to common area property for lot owners, but does not designate any of C.C. Partners' retained property as common area property. The Declaration does not provide or convey lot owners any right of access or use to the retained property.

Absent a specific restriction within the Declaration, the law presumes the free and unrestricted use of land. *See Long*, 271 N.C. at 268, 156 S.E.2d at 238. The trial court properly observed and stated: "An intent to build a golf course is not necessarily the same [as] the intent to burden [the] land in perpetuity for golf use only." When interpreted as a whole, the Declaration clearly shows the intent of C.C. Partners was to reserve the right to develop a golf course, which was, in fact, developed and operated for over twenty years, rather than to perpetually restrict the use of the property. Plaintiffs arguments are overruled.

## C. Implied Easement

Plaintiffs also argue C.C. Partners' plat maps and community promotion materials imposed an easement-by-plat, requiring the golf course property to be perpetually used only for golf. We disagree.

> It is a settled principle in this State that when the owner of land, located within or without a city or town, has it subdivided and platted into lots, streets, alleys, and parks, and sells and conveys the lots or any of them with reference to the plat, nothing else appearing, he thereby dedicates the streets, alleys, and parks, and all of them, to the use of the purchasers, and those claiming under them, and of the public.

*Gaither v. Albemarle Hosp., Inc.*, 235 N.C. 431, 443, 70 S.E.2d 680, 690 (1952).

> The general rule is based on principles of equitable estoppel, because purchasers who buy lots with reference to a plat are induced to rely on the implied representation that the "streets and alleys, courts and parks" shown thereon will be kept open for their benefit. Consequently,

the grantor of the lots is "equitably estopped, as well in reference to the public as to his grantees, from denying the existence of the easement thus created."

*Harry v. Crescent Resources, Inc.*, 136 N.C. App. 71, 77, 523 S.E.2d 118, 122 (1999) (quoting *Gaither*, 235 N.C. at 444, 70 S.E.2d at 690).

For an easement implied-by-plat to be recognized, the plat must show the developer clearly intended to restrict the use of the land at the time of recording for the benefit of all lot owners. *See id.* (holding that because the free use of property is favored in this State, the depiction of remnant parcels on the plat was insufficient to show a clear intent by the developer to grant an easement setting them aside as open space).

Here, the 1995 survey plat relied upon by Plaintiffs does not show an intent to restrict the uses of the golf course property. The survey plat reflects five un-subdivided tracts of land labeled as "A, B, C, D and "F," some previously subdivided lots, and the dotted line location of the golf course greens and fairways. Metes and bounds descriptions are shown *only* for the five un-subdivided tracts. The 1995 survey plat did not create any residential lots and only carved out the five tracts, A, B, C, D and F, from the original tract. All residential lots shown on the survey plat were previously subdivided and were shown on the 1995 survey plat for illustrative purposes.

This fact renders the rule in *Gaither* inapplicable here. *See Gaither*, 235 N.C.

at 443, 70 S.E.2d at 690 (An implied easement may be recognized in favor of the lot purchaser "when the owner of land . . . has it subdivided and platted into lots, streets, alleys, and parks, and sells and conveys the lots or any of them with reference to the plat.").

The implied-by-plat rule in *Gaither* is also inapplicable at bar, because C.C. Partners did not sell any residential lot to any Plaintiff by reference to the survey plat. Plaintiffs purchased a total of seventy-eight lots in Crooked Creek. *None* of these deeds reference the 1995 survey plat Plaintiffs claim they relied upon.

In *Cogburn v. Holness*, 34 N.C. App. 253, 237 S.E.2d 905 (1977), potential purchasers of a former golf course argued the land was burdened by an easement implied-by-plat, which limited the use of the property to golf activities. The plats referred to in the plaintiffs' deeds did "not show nor even contain a reference to a golf course," even though plats earlier in the chain of title did. *Id.* at 259, 237 S.E.2d at 908. This Court held the deeds failed to establish a dedication of land for a golf course or a restriction on development. *Id.* at 259-60, 237 S.E.2d at 908-09.

The same is true in this case. None of Plaintiffs' deeds reference plats recorded by C.C. Partners, which depict a golf course. The plats, which depict a dotted outline of a golf course do not bind the land for golf use for the benefit of Plaintiffs or create any easement or common use right to the property.

Plaintiffs rely primarily on this Court's decision in *Shear v. Stevens Bldg. Co., Inc.*, 107 N.C. App. 154, 418 S.E.2d 841 (1992). In *Shear*, residential lots were sold by the developer in the subdivision known as Cardinal Hills in Raleigh. *Id.* at 157, 418 S.E.2d at 845. The plat map for Cardinal Hills, filed in 1956 and revised in 1957, depicted approximately three hundred subdivided lots. *Id.* The plat map also depicted a lake known as White Oak Lake, and undeveloped areas surrounding the lake, which included a future playground. *Id.* at 160-61, 418 S.E.2d at 845. Neither the deeds nor the restrictive covenants referenced any easement relating to use of the lake. *Id.*

The plaintiffs in *Shear* presented evidence tending to show that lot purchasers were told the use of White Oak Lake was for residents of Cardinal Hills; that residents of the subdivision commonly used the lake; residents were told that the undeveloped land around the lake was for the use of the community; and that residents were encouraged to maintain the portion of the undeveloped land adjoining their properties. *Id.* at 157-58, 418 S.E.2d at 843. The developer advertised "lakefront" lots for sale in Cardinal Hills, and described the lots as overlooking "one of Wake County's most beautiful lakes." *Id.* at 158, 418 S.E.2d at 843-44.

In 1988, the developers learned the earthen dam, which created White Oak Lake, was in need of repairs. *Id.* at 159, 418 S.E.2d at 843. Instead of repairing the dam, the developers partially drained and lowered the lake, which created additional

undeveloped lands surrounding the lake. *Id.* The developers then filed a plat map in 1988, which divided the undeveloped land around the lake and the additional land obtained by draining the lake, into twenty-four lots. *Id.*

This Court held a lot owner's easement to the lake existed, solely because all deeds to lots sold in Cardinal Hills referenced the plat map, which showed the lake. *Id.* at 161, 418 S.E.2d at 846. The Court further noted that "oral representations and actions" by the developers "concerning the lake and the surrounding undeveloped property necessarily include the undeveloped areas around the lake in the scope of the easement." *Id.* at 163, 418 S.E.2d at 846. "These representations and actions, along with the use of the plat map and its depiction of the lake and property, decidedly show an intent to create an easement to the lake and surrounding undeveloped property." *Id.*

The facts of this case are distinguishable from those before this Court in *Shear*. Most notably, the deeds to the lots in *Shear* referenced a plat map, which showed the lake. Here, none of Plaintiffs' deeds referenced the 1995 survey map, which carved out the five tracts to be sold to MacGregor. Furthermore, the restrictive covenants in *Shear* were silent as to the potential for future development of the lake, unlike the future development clause in this case. For these reasons, *Shear* does not support Plaintiffs' claim.

While Crooked Creek subdivision may have been contemplated and marketed as a golf course community to induce Plaintiffs to purchase lots in the subdivision, no case has recognized an implied easement or restrictive covenants being imposed on undeveloped land, based upon statements in marketing materials. Courts have recognized marketing materials as further demonstrating the expressed intent of the developer, but only where a recorded instrument exists to demonstrate the intent to encumber and restrict the land. *See id.*; *see also Cogburn*, 34 N.C. App. at 259-60, 237 S.E.2d at 908-09. That is not the circumstances present in this case.

## IV. Conclusion

"Restrictive servitudes in derogation of the free and unfettered use of land are to be strictly construed so as not to broaden the limitation on the use." *Reed v. Elmore*, 246 N.C. 221, 224, 98 S.E.2d 360, 363 (1957). Plaintiffs have failed to show C.C. Partners intended to restrict the golf course property to a perpetual golf-only use where: (1) the Declaration does not contain any express language restricting the uses of the property; (2) the Declaration specifically allows for the future development of the "Golf Course property" into residential lots or other uses; (3) the 1995 survey map relied upon by Plaintiffs is not referenced in any of Plaintiffs' deeds; and, (4) the 1995 survey map does not establish any residential lots and was prepared for the purpose of conveying the five large undeveloped tracts, A, B, C, D, and F.

The trial court correctly denied Plaintiffs' motion for summary judgment and granted summary judgment in favor of Defendants. The trial court's order is affirmed. *It is so ordered.*

AFFIRMED.

Chief Judge McGEE and Judge INMAN concur.