Am. Air Filter Co. v. Price, 2018 NCBC 68.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

AMERICAN AIR FILTER
COMPANY, INC. d/b/a AAF
INTERNATIONAL,

             Plaintiff,

   v.

SAMUEL C. PRICE, JR. and
CAMFIL USA, INC. d/b/a CAMFIL
AMERICAS,

             Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 13610

**OPINION AND ORDER ON
PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT,
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT, AND
DEFENDANTS' MOTION TO STRIKE**

THIS MATTER comes before the Court on Plaintiff American Air Filter Company, Inc.'s Motion for Partial Summary Judgment (ECF No. 44); Defendants Samuel C. Price, Jr. and Camfil USA, Inc.'s Motion for Summary Judgment (ECF No. 48) (collectively with Plaintiff's Motion for Partial Summary Judgment, the "Motions"); and Defendants' Motion to Strike ("Motion to Strike"; ECF No. 74).

THE COURT, having considered the Motions and the Motion to Strike, the briefs in support of and in opposition to the Motions and the Motion to Strike, the evidentiary materials filed by the parties, the arguments of counsel at the hearing, and other appropriate matters of record, concludes that the Motion to Strike should be DENIED, and that the Motions should be GRANTED, in part, and DENIED, in part, in the manner and for the reasons set forth below.

    *Young Moore and Henderson, P.A. by Christopher A. Page and Jonathan
    L. Crook for Plaintiff American Air Filter Company, Inc.*

    *Smith Moore Leatherwood LLP by Jeffrey R. Whitley and George J.
    Oliver for Defendants Samuel C. Price, Jr. and Camfil USA, Inc.*

McGuire, Judge.

## FACTUAL AND PROCEDURAL BACKGROUND

1.     While findings of fact are not necessary or proper on a motion for summary judgment, "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Collier v. Collier*, 204 N.C. App. 160, 161–62, 693 S.E.2d 250, 252 (2010).  Therefore, the Court limits its recitation to the undisputed facts necessary to decide the Motion and not to resolve issues of material fact.

2.     Plaintiff American Air Filter Company, Inc. ("Plaintiff") is in the business of providing and servicing clean air products, such as air filters, dust collection equipment, HVAC equipment, and nuclear equipment and filters.  (Ver. First Am. Compl., ECF No. 5, at ¶ 6.)  Plaintiff has operations across the world and conducts business throughout the United States, including in Wake County, North Carolina.

3.     Defendant Camfil USA, Inc. ("Camfil") is in the same business as Plaintiff and is one of Plaintiff's "primary competitors."  (*Id.* at ¶ 10.)  Camfil also conducts business throughout the United States, including in Wake County, North Carolina.

4.     Plaintiff hired Defendant Samuel C. Price ("Price"; together with Camfil, "Defendants") to be a Branch Manager in 1989.  Plaintiff employed Price as either a Branch Manager or a District Manager until his resignation on August 12, 2016.  (Price Dep., ECF No. 45.4, at pp. 56, 60–63.)  His duties in those positions

involved sales, sales management, and warehouse support. (*Id.* at p. 56.) As a condition of employment, Plaintiff required Price to sign employment agreements which set out the respective rights and responsibilities of Price and Plaintiff in relation to Price's employment with the company, the first of which was executed on December 11, 1989. (ECF No. 5, at ¶ 38.) Thereafter, Plaintiff periodically entered into new agreements with Price during the remainder of his employment. (*Id.* at ¶ 42.)

5. During his employment, Price had access to and used in performing his duties several different computer-based programs that contain information and data that Plaintiff considers to be "trade secrets": the Total Cost of Ownership Diagnostics (the "TCOD") program, Salesforce.com ("Salesforce"), and the SAP ("SAP"), an enterprise resource planning software. (Price Dep., ECF No. 61, at pp. 89–90, 107.) The TCOD is a proprietary program that utilizes custom "engines" (algorithms) to calculate the total cost of using Plaintiff's air filters versus competitors' air filters over time and generates reports ("TCOD reports") that contain the results of those calculations. (Am. Air Filter's Ver. Resps. Defs.' First Set Interrogs. Req. Produc. Docs., ECF No. 45.3, at pp. 13–17, 19–20; ECF No. 45.4, at p. 100; TCOD Report, ECF No. 45.5.) Plaintiff has compiled within the TCOD a database of information including test reports for various air filters and information regarding the filtration needs of specific customers. (ECF No. 45.3, at p. 14; ECF No. 45.4, at p. 106.) Price testified that he considered the information in the TCOD to be proprietary to Plaintiff. (ECF No. 45.4, at p. 102.)

6.    Plaintiff provides copies of TCOD reports to customers and prospective customers. TCOD reports contain the following statement purporting to restrict customers from further disclosing the reports: "The information in this document is the property of American Air Filter Company, Inc. ('AAFCI') and may not be copied or distributed to any third party, used for any purpose other than that for which it is supplied, without the express written consent of AAFCI." (ECF No. 45.3, at pp. 18–19.) Plaintiff, however, has granted access to the TCOD to three distributors but has not obtained agreements from the distributors regarding the confidentiality of the information in the TCOD. (*Id.* at p. 18.)

7.    Salesforce is a web-based tool used by Plaintiff for customer and sales management. Plaintiff has compiled information in Salesforce regarding its customers, including custom payment terms, payment history, order history, notes prepared by sales representatives, reports prepared by sales representatives analyzing current filtration needs, and currently used products. (ECF No. 45.3, at pp. 19–20.) Salesforce also contains information regarding Plaintiff's prospective customers, including identities of prospective customers, the estimated value of the relationship if secured, notes prepared by sales representatives, and price quotes made by Plaintiff for prospective customers. (*Id.* at p. 20–21.) Finally, Salesforce contains audit reports that Plaintiff's sales professionals create at the physical location of customer facilities to assess and analyze customers' current air filtration products, sizes, specifications, and other issues; the audit reports are then used to sell products based on the customer's needs. (*Id.*)

8.     SAP contains, among other information, a compilation of data that includes customer-specific pricing, information about national accounts and confidential rebates and other discounts offered to national customers, and a sales history for each customer. (*Id.* at 20–21.) SAP also contains information regarding the costs of raw materials used in Plaintiff's manufacturing process and other data regarding Plaintiff's production costs. (*Id.* at p. 21.) Price testified that the information compiled in Salesforce and SAP was confidential and valuable to Plaintiff. (ECF No. 45.4, at pp. 87–88, 90–94.)

9.     The TCOD, Salesforce, and SAP each permit users to manipulate the compiled data contained within the programs to run various reports, quotes, projections, and estimates. (ECF No. 45.3, at pp. 17–18, 20.) Each of the three programs are username and password protected. (ECF No. 45.4, at pp. 80–81.)

10.     In 2016, Price became unhappy working for Plaintiff because of a new compensation plan Plaintiff had implemented and because Price was turned down for a promotion. (*Id.* at pp. 193–94, 221–22.) On July 12, 2016, Price had dinner with Tom Rumpler ("Rumpler"), Camfil's Director of Branch Operations – East. (Rumpler Dep., ECF No. 45.9, at p. 73.) Rumpler proposed that Price take the position of Branch Manager for Camfil's Carolinas territory. (*Id.* at p. 74.) Camfil had been attempting to recruit Price for five years. (ECF No. 45.4, at p. 181.) In fact, Camfil's Vice President of Sales and Marketing, Kevin Wood ("Wood"), wrote in an internal email on July 19, 2016 that hiring Price would "send a message to [Plaintiff's] employees that we are the force to deal with." (ECF No. 45.9, Ex. 33.)

11. Following his dinner with Rumpler, Price emailed his most recent employment agreement with Plaintiff to his wife's Gmail account and then forwarded the agreement from his wife's Gmail account to Rumpler's wife's Gmail account. (ECF No. 45.4, at p. 208.) The purpose of using their wives' Gmail accounts was to ensure that Price's negotiations with Camfil were kept secret from Plaintiff. (ECF No. 45.4, at p. 212; ECF No. 45.9, at pp. 84–85.) Price testified that he "probably" deleted the email that he sent from his work email to his wife's Gmail account. (ECF No. 45.4, at pp. 208.) Price also testified that if Plaintiff had learned of his negotiations with Camfil, he would have been "immediately terminated." (*Id.* at 220.)

12. On July 22, 2016, Camfil offered Price employment. Price negotiated the terms of that employment until on or around August 1, 2016 using his wife's Gmail account. (ECF No. 45.4, at pp. 228–29.) Price officially signed an employment agreement with Camfil on August 1, 2016. (*Id.* at p. 236.)

13. On August 5, 2016, Price informed Plaintiff that he was resigning effective August 12, 2016. (ECF No. 61, at pp. 239–40 and Ex. 17.) Price informed various co-workers that he was "burned out" and that he was taking time off to be with his first grandchild. (*Id.* at 225.) Price did not notify Plaintiff that he had accepted employment with Camfil. When two co-workers asked if Price was leaving to go work for a competitor, Price said that he was not. (ECF No. 45.3, at p. 5.) Price testified that he was aware that Plaintiff's policy was to terminate the employment of an employee if Plaintiff learned the employee may be leaving to join a competitor. (ECF No. 45.4, at pp. 219–20.)

14.     From the time that Price began negotiating with Camfil until his resignation from Plaintiff on August 12, 2016, Price utilized several of Plaintiff's programs. He logged into Salesforce on July 29, August 4, and August 6, 2016, and he executed numerous "transactions" in SAP between August 2 and August 12, 2016. (Price Aff., ECF No. 15, Ex. 1 at ¶ 38; Megonnell Aff., ECF No. 52, at ¶¶ 4–6.) Price testified that he accessed the Salesforce and SAP programs as part of fulfilling his job duties for Plaintiff. (ECF No. 15, Ex. 1 at ¶ 38; ECF No. 45.4, at p. 94.)

15.     Price accessed the TCOD on July 30 and August 1, 2016, during which he generated several TCOD reports. Price testified that he generated those reports as part of his training on the TCOD. (ECF No. 61, at p. 254.) He also testified that he generated some of the TCOD reports "in preparation of . . . seeing some comparisons between some Camfil product" and the products Plaintiff sold. (*Id.* at p. 255.) Price noted that these reports were "generic" and based on numbers that Price put in while he was "playing around with [the TCOD], like a calculator." (*Id.*) The reports were never sent to any customer. (*Id.*) There is no evidence in the record that Price retained those TCOD reports. (*Id.* at p. 305.)

16.     While employed by Plaintiff, Price worked with one of Plaintiff's customers, Cape Fear Valley Medical Center ("CFVMC"), on an air filtration quality control project. (ECF No. 61, at pp. 241–43.) Price created a spreadsheet for the project (the "CFV Spreadsheet") that used formulas based on a survey of CFVMC's facility to calculate and automate CFVMC's blanket purchase orders of Plaintiff's products. (*Id.* at p. 241; ECF No. 45.4, Ex. 24.) On August 10, 2016, Price sent the

CFV Spreadsheet to Richard Logsdon ("Logsdon") at CFVMC, and Price informed Logsdon that he would be leaving Plaintiff to work for another company. (ECF No. 61, at pp. 240–42; ECF No. 45.4, Ex. 23.)

17. Upon his resignation on August 12, 2016, Price was required by Plaintiff to return all company property, equipment, and manuals using an Exit Checklist. (ECF No. 5.1, Ex. E; ECF No. 45.3, at p. 10.) On August 16, 2016, Plaintiff also terminated Price's electronic accounts, backed up his user data, and forwarded key emails to another employee in order to transition Price's customer relationships. (ECF No. 45.3, at p. 10.)

18. After joining Camfil, Price received an email from Logsdon containing the CFV Spreadsheet and asking Price to make certain changes to the CFV Spreadsheet. Price informed Logsdon that he now worked for Camfil and that he would help them "facilitate continuing to do business with [Plaintiff]" by adjusting the CFV Spreadsheet per CFVMC's request. (ECF No. 61, at p. 243.) Logsdon "really pushed" Price to find out why Price had left Plaintiff. (*Id.* at 242.) Although Price did not think CFVMC would want to work with Camfil instead of Plaintiff for its air filtration needs, Price then sent a modified version of the CFV Spreadsheet to Logsdon that included Camfil's price list and had Camfil's name and logo at the top of the spreadsheet. (*Id.* at p. 244.)

19. Shortly after August 12, 2016, Plaintiff discovered that Price had gone to work for Camfil. (ECF No. 5, at ¶ 69.) On August 17, 2016, Plaintiff's counsel sent a letter to Price reminding him of his obligations under his employment contract with

Plaintiff, as well as reminding him of his affirmation upon his resignation that he would keep secret certain confidential matters of Plaintiff and its customers. (ECF No. 5, Ex. F.) Plaintiff's counsel sent a similar letter on September 1, 2016 to Armando Brunetti ("Brunetti"), Executive Vice President of Camfil. (*Id.* at Ex. G.) Brunetti then spoke to Price about whether Price had contacted any of Plaintiff's customers. Price subsequently sent an email to Brunetti detailing the interactions he had had with Plaintiff's customers since he began employment with Camfil, including his correspondence with Logsdon at CFVMC, and attached the modified CFV Spreadsheet that he had sent Logsdon. (ECF No. 45.2, at pp. 111, 115; ECF No. 45.4, Ex. 23.)

20. On November 4, 2016, Plaintiff commenced this lawsuit by filing a Complaint. (ECF No. 1). Plaintiff subsequently filed its Verified First Amended Complaint on December 5, 2016 ("Amended Complaint"; ECF No. 5.) The Amended Complaint asserted claims for: breach of contract against Price; breach of fiduciary duty against Price; tortious interference with contract against Camfil; violation of the North Carolina Trade Secrets Protection Act ("NCTSPA"), N.C. Gen. Stat. § 66-152 et. seq. (hereinafter, "G.S.") against Price and Camfil; violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA," G.S. § 75-1.1 et. seq.) against Price and Camfil; and civil conspiracy against Price and Camfil.

21. On December 9, 2016, Plaintiff filed a Motion for Preliminary Injunction. (ECF No. 11.) On February 3, 2017, the Court issued an order granting

in part and denying in part the Motion for Preliminary Injunction. (Order Mot. Prelim. Inj., ECF No. 25.)

22. On January 17, 2017, Defendants filed a Motion to Dismiss. (ECF No. 18.) On June 26, 2017, the Court granted in part and denied in part the Motion to Dismiss, dismissing the claims against Price for breach of contract and breach of fiduciary duty, and the claim against Camfil for tortious interference with contract. (Op. Order Defs.' Mot. Dismiss Pl.'s First Am. Compl., ECF No. 39, at p. 28.)

23. On January 26, 2018, Plaintiff filed its Motion for Partial Summary Judgment and accompanying brief, exhibits, and affidavits. (ECF Nos. 44–47.) Plaintiff seeks partial summary judgment in its favor on its claims for misappropriation of trade secrets and for unfair and deceptive trade practices. Defendants filed their Motion for Summary Judgment and accompanying brief and exhibits on the same day, moving for summary judgment on the claims of misappropriation of trade secrets, unfair and deceptive trade practices, and civil conspiracy. (ECF Nos. 48–49.) On February 26, 2018, both Plaintiff and Defendants filed their respective responses to the other side's motion for summary judgment (ECF Nos. 66 and 70), and on March 8, 2018, Plaintiff and Defendants filed their respective replies (ECF Nos. 80 and 84). On February 26, 2018, Defendants also filed a Motion to Strike the affidavits of Kim Megonnell and Danny Hornback. (ECF No. 74.) Plaintiff filed its response to the Motion to Strike on March 19, 2018 (ECF No. 90), and Defendants did not file a reply. The Court held a hearing on the Motions

and on the Motion to Strike on March 29, 2018. The Motions and the Motion to Strike are now ripe for resolution.

ANALYSIS

I.     Motion to Strike

24.     In the Motion to Strike (ECF No. 74), Defendants argue that the affidavits of Kim Megonnell and Danny Hornback (ECF Nos. 52 and 46, respectively) should be stricken as untimely. Defendants assert that Plaintiff withheld the information contained in the affidavits until after discovery had closed before filing the affidavits with the Court, in violation of the discovery rules. (Mem. Supp. Defs.' Mot. Strike, ECF No. 75, at p. 2.) Plaintiff argues that it did in fact disclose the information contained in the affidavits to Defendants and that it identified Megonnell as a key witness whom Defendants chose not to depose; and that in any event Defendants have not been prejudiced by the affidavits. (Br. Resp. Defs.' Mot. Strike, ECF No. 90, at p. 3.)

25.     Motions to strike are addressed to the sound discretion of the Court. *Kingsdown, Inc. v. Hinshaw*, 2016 NCBC LEXIS 15, *8 (N.C. Super. Ct. Feb. 17, 2016) (citing *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 25, 588 S.E.2d 20, 25 (2003)). The Court, in its discretion, will consider the above-referenced affidavits submitted by Plaintiff. Defendants' Motion to Strike the affidavits is DENIED.

II.     Motions for Summary Judgment

        A.      *Summary Judgment Standard*

        26.     Plaintiff and Defendants have both moved for summary judgment on Plaintiff's claims for misappropriation of trade secrets and for violation of the UDTPA. The Court must determine if the dispositive facts involved in these claims are undisputed and, if so, which party, if any, is entitled to summary judgment on those claims. In addition, Defendants have moved for summary judgment on Plaintiff's allegation of civil conspiracy.

        27.     "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that any party is entitled to judgment as a matter of law." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (internal quotations omitted). An issue is "material" if "resolution of the issue is so essential that the party against whom it is resolved may not prevail." *Unitrin Auto & Home Ins. Co. v. McNeill*, 215 N.C. App. 465, 467, 716 S.E.2d 48, 50 (2011). The moving party bears "the burden of clearly establishing lack of a triable issue to the trial court." *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182, 711 S.E.2d 114, 116 (2011) (internal quotations omitted). The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would have been barred by an affirmative defense." *Variety Wholesalers*, 365 N.C. at 523, 723 S.E.2d at 747. In considering a motion for summary judgment, all

evidence is viewed in the light most favorable to the nonmoving party. *Mosely v. WAM, Inc.*, 167 N.C. App. 594, 597, 606 S.E.2d 140, 142 (2004).

28. "If the movant demonstrates the lack of a genuine issue of material fact, the burden shifts to the non-movant to present specific facts which establish the presence of a genuine factual dispute for trial." *Friends of Crooked Creek, L.L.C. v. C.C. Partners, Inc.*, 802 S.E.2d 908, 911–12, 2017 N.C. App. LEXIS 568, at *8 (2017) (quoting *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008)). In determining whether the non-movant has met its burden, the judge "unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict . . . ." *Sloan v. Miller Bldg. Corp.*, 119 N.C. App. 162, 165–66, 458 S.E.2d 30, 32 (1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (emphasis omitted). As recently reiterated by the North Carolina Court of Appeals, the burden on the nonmovant goes beyond merely producing some evidence, or a scintilla of evidence, in support of its claims. Rather,

> [i]f the movant meets [its] burden, the nonmovant must take affirmative steps to set forth specific facts showing the existence of a genuine issue of material fact. An adverse party may not rest upon the mere allegations or denials of his pleading. A genuine issue of material fact is one that can be maintained by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference.

*Khashman v. Khashman*, 2017 N.C. App. LEXIS 715, at *15 (Sept. 5, 2017) (internal citations and quotation marks omitted). In summary, this Court must decide "not whether there is literally no evidence, but whether there is any [evidence] upon which

a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson*, 477 U.S. at 251.[1]

### B. *Misappropriation of Trade Secrets*

29. In the Amended Complaint, Plaintiff alleges that Price and Camfil violated the NCTSPA by misappropriating Plaintiff's trade secrets. Specifically, Plaintiff claims that while employed with Plaintiff, Price had access to Plaintiff's trade secrets and that he "accessed, disclosed, and/or used [Plaintiff's] trade secrets . . . without the knowing and voluntary authority or consent, written or otherwise, of [Plaintiff]" while acting as an agent of Camfil. (ECF No. 5, at ¶¶ 109, 111.) The trade secrets that Plaintiff alleges Price misappropriated are the TCOD and confidential information in the TCOD; confidential information within SAP and Salesforce; and information contained in the CFV Spreadsheet.[2] Defendants argue that the information in the TCOD, Salesforce, and SAP are not trade secrets under the NCTSPA and that Plaintiff has failed to provide substantial evidence of misappropriation. (Defs.' Resp. Opp. Pl.'s Mot. Partial Summ. J., ECF No. 70, at pp.

---

[1] The Supreme Court of North Carolina has held that "Federal Rule 56 is substantially the same as our Rule 56, and we therefore look to the Federal decisions for guidance in applying our rule." *Singleton v. Stewart*, 280 N.C. 460, 464, 186 S.E.2d 400, 403 (1972); *see also Dendy v. Watkins*, 288 N.C. 447, 452, 219 S.E.2d 214, 217 (1975) ("Federal Rule 56 is substantially the same as Rule 56 of Chapter 1A-1 of the General Statutes and, therefore, it is proper for us to look at the federal decisions and textbooks as well as our own for guidance in applying the rule.").

[2] To the extent that Plaintiff alleged that Defendants misappropriated other programs or information that Plaintiff uses, such as its Territory Data Sheets, Sales Scorecards, Qlikview, and The Sales Portal, (*see* ECF No. 5, at ¶ 19; ECF No. 45.3, at p. 21), Plaintiff has not pointed the Court to any evidence nor made argument regarding misappropriation of those programs or information contained in those programs. The Court does not consider these programs as part of Plaintiff's claim for misappropriation of trade secrets.

2–13.)  Plaintiff and Defendants both seek summary judgment on Plaintiff's claim for misappropriation of trade secrets.

30.    Under the NCTSPA, "misappropriation" is defined as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret."  G.S. § 66-152(1).  In order to evaluate a claim for misappropriation of trade secrets, the Court must first consider whether the alleged information constitutes a trade secret.  A "trade secret" is defined as

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

G.S. § 66.152(3).

31.    "Trade secret protection is generally precluded for information that is widely available or generally known in the relevant industry."  *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *31 (N.C. Super. Ct. Feb. 18, 2016).  Public information such as client names, customer contact information, or published prices for products is usually not considered a trade secret.  *See Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *26 (N.C. Super. Ct. Apr. 23, 2015)

(citing *Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 370–71, 555 S.E.2d 634, 640 (2001)).  However, "in some instances, a trade secret can be found if the information or process has particular value as a compilation or manipulation of information, even if the underlying information is otherwise publicly available."  *RoundPoint*, 2016 NCBC LEXIS 18, at *32.

32.     This Court has held that "where an individual maintains a compilation of detailed records over a significant period of time," such that they have particular value as a compilation or manipulation of information, "those records could constitute a trade secret even if 'similar information may have been ascertainable by anyone in the . . . business.'" *Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at *13 (N.C. Super. Ct. May 1, 2015) (quoting *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 376, 542 S.E.2d 689, 692 (2001)); *see also State ex rel. Utils. Comm'n v. MCI Telecomms., Corp.*, 132 N.C. App. 625, 634, 514 S.E.2d 276, 282 (1999) (concluding that a "compilation of information" involving customer data and business operations which has "actual or potential commercial value from not being generally known" is sufficient to constitute a trade secret under the NCTSPA); *RoundPoint*, 2016 NCBC LEXIS 18, at *31–32; *Red Valve v. Titan Valve*, 2018 NCBC LEXIS 41, at *27 (N.C. Super. Ct. Apr. 17, 2018) (citing *Koch*, *Byrd's*, and *RoundPoint*).

### i.     *The CFV Spreadsheet is not a trade secret*

33.     The undisputed evidence establishes that the CFV Spreadsheet is not a trade secret under the NCTSPA.  Plaintiff, through Price, provided the spreadsheet

to CFVMC while Price was still employed with Plaintiff and in an effort to secure a sale from CFVMC. Plaintiff does not argue and presents no evidence that Plaintiff asked CFVMC to maintain the spreadsheet or the pricing contained therein in confidence. Generally, when a party discloses proprietary information to a third party without taking measures to maintain its confidentiality, the information cannot be considered a trade secret under the NCTSPA. *See Bldg. Ctr., Inc. v. Carter Lumber of the North, Inc.,* 2017 NCBC LEXIS 85, at *24–25 (N.C. Super. Ct. Sept. 21, 2017) (generally, "a price quote, once provided to the customer" can no longer "be considered a trade secret"); *Computer Design & Integration, LLC v. Brown*, 2017 NCBC LEXIS 8, at *25 (N.C. Super. Ct. Jan. 27, 2017) (holding that plaintiff failed to establish adequate measures to maintain secrecy of its quotes to customers because, inter alia, "the evidence of record shows that [plaintiff] did not require its customers to maintain the confidentiality of this information").

34. In addition, Defendants provided unrebutted evidence that the prices paid by CFVMC are publicly available to Camfil because CFVMC is a public hospital. (ECF No. 49, at p. 17; ECF No. 55.17.)

35. Because the CFV Spreadsheet is not a trade secret, Plaintiff's Motion is DENIED, and Defendants' Motion is GRANTED, as to Plaintiff's claim for misappropriation of trade secrets regarding the CFV Spreadsheet.

### ii. *There is no evidence that Defendants misappropriated any proprietary algorithms or "engines" used in the TCOD*

36. To the extent Plaintiff is attempting to allege that Price and Camfil misappropriated the algorithms or underlying "engines" that perform the

calculations in the TCOD, Plaintiff has not put forth any evidence to support such a claim. Although Price had access to the TCOD, there is no evidence he had access to the underlying algorithms upon which the TCOD functioned or had any knowledge of the specific operations of the underlying "engines." Accordingly, to the extent that Plaintiff's claim for misappropriation of trade secrets includes misappropriation of the algorithms or "engines" underlying the TCOD or any other of Plaintiff's programs, Plaintiff's Motion is DENIED, and Defendants' Motion is GRANTED.

### iii. *There is a dispute of material fact regarding whether the data in the TCOD is a trade secret*

37. The evidence in the record regarding the data and information compiled in the TCOD is muddled. There is evidence suggesting that the TCOD contains data and information acquired from Plaintiff's customers and prospective customers, but the TCOD may also contain certain testing information regarding air filters and filter systems that is widely available.

38. Furthermore, the evidence regarding Plaintiff's efforts to maintain the confidentiality of the TCOD is less than clear. On the one hand, Plaintiff has admitted that it provided three distributors access to the TCOD and that those distributors have not signed Plaintiff's standard TCOD Program Usage Application Agreement. (ECF No. 45.3, at p. 18.) On the other hand, Plaintiff has presented evidence that each TCOD report includes a condition stating that the information may not be copied or distributed without Plaintiff's express written consent. (*Id.* at pp. 18–19.) It is unclear from the evidence presented what level of access the

distributors had to the TCOD and what exact efforts were taken to maintain the confidentiality of the TCOD reports.

39. On the present record, there are disputed facts regarding whether or not the information compiled in the TCOD is a protectable trade secret under the NCTSPA. Accordingly, to the extent that Plaintiff's claim for misappropriation of trade secrets includes misappropriation of the data and information compiled in the TCOD, Plaintiff's Motion is DENIED, and Defendants' Motion is DENIED.

### iv. *The data and information compiled in Salesforce and the SAP are trade secrets*

40. Plaintiff has presented evidence that it has compiled in Salesforce and SAP customer-specific data and information that constitute trade secrets within the definition of the NCTSPA. The information goes far beyond the mere identities and sales histories of Plaintiff's customers. The programs generally permit the manipulation of data to perform calculations and create unique reports. The ability of these programs to compile data and allow for the manipulation of that data for specific customers brings the data maintained by Plaintiff in these programs into the realm of trade secrets. Defendants make no substantial argument that the customer-specific data, information, and reports, as compiled within Plaintiff's Salesforce and SAP, are not trade secrets. (Mem. Supp. Defs.' Mot. Summ. J., ECF No. 49, at pp. 21–22; ECF No. 70, at p. 6.) In fact, Camfil's corporate representative testified that Camfil considers the same information that it has compiled within its own sales and enterprise planning programs to be confidential and proprietary. (ECF No. 45.2, at pp. 35, 40–43.)

41.     The Court must next consider whether Plaintiff has established a prima facie case that Defendants misappropriated information compiled in the TCOD, Salesforce, or SAP.  A prima facie case of misappropriation is established by introducing "substantial evidence" that the defendant: "(1) knows or should have known of the trade secret; and (2) has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner."  G.S. § 66-155.  A prima facie case of misappropriation may be established by circumstantial evidence.  *TSG Finishing, LLC v. Bollinger*, 238 N.C. App. 586, 595, 767 S.E.2d 870, 878 (2014).

42.     Preliminarily, Plaintiff has not produced evidence that Defendants have actually used or disclosed information compiled in the TCOD, Salesforce, or SAP programs.   Plaintiff cannot identify any specific documents or information downloaded or taken by Price.  (ECF No. 45.3, at pp. 8–9.)  Price expressly denies that he downloaded or took any trade secret information from Plaintiff's programs.  (ECF No. 61, at pp. 246, 251, 305–06.)  In addition, while it is undisputed that Price contacted some of Plaintiff's customers after joining Camfil, Plaintiff does not claim that Camfil has successfully solicited away any of Plaintiff's customers or provided other evidence that might raise an inference of misappropriation.  *See, e.g.*, *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 659, 670 S.E.2d 321, 329 (2009) (holding that a former employee's accessing of employer's trade secret information during last few weeks of employment along with, inter alia, "evidence of a substantial turnaround in [the defendant]'s business, as well as a concurrent, substantial

decrease in [the employer]'s business in the same market, during the same time period" supported inference that defendant used the plaintiff's trade secret information); *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC,* 174 N.C. App. 49, 57–58, 620 S.E.2d 222, 229 (2005) (holding that circumstantial evidence of the defendant's access to trade secrets combined with a substantial increase in the defendant's business, and concurrent, substantial decrease in the plaintiff's business in the same locations, during the same time period, was sufficient to establish a prima facie case of misappropriation of trade secrets); *Byrd's Lawn & Landscaping*, 142 N.C. App. 371, 376–377, 542 S.E.2d 689, 693 (2001) (holding that evidence that former employee accessed historical pricing data immediately before resigning to create competing landscaping business and then underbid former employer on eight out of eleven projects was circumstantial evidence of use of trade secrets).

> ### v.    *The facts are disputed as to whether Price's access to the TCOD, Salesforce, and SAP support an inference of actual misappropriation*

43.    Plaintiff relies on the inferences to be drawn from the facts surrounding Price's accessing the TCOD, Salesforce, and SAP programs after accepting employment with Camfil and before his last day of employment with Plaintiff as evidence of Price's actual misappropriation of the trade secrets.   This Court previously looked to the Fourth Circuit Court of Appeals' analysis in *RLM Communications, Inc. v. Tuschen*, 831 F.3d 190 (4th Cir. 2016) in determining whether a plaintiff established a prima facie case of misappropriation under G.S. § 66-155 based solely on access and  opportunity to acquire the trade secret.  *Am. Air*

*Filter Co. v. Price*, 2017 NCBC LEXIS 9, at \*20–24 (N.C. Super. Ct. Feb. 3, 2017).  In

*RLM*, the court held that a plaintiff could establish a prima facie case creating an

inference of misappropriation based solely on access to its trade secrets in one of two

ways.  First, the plaintiff could

> show that the defendant [h]as had a specific opportunity to
> acquire [the trade secret] for disclosure or use . . . without
> the express or implied consent or authority of the owner . . .
> the employer would have to prove not merely that its
> employee had access to trade secrets, but also that the
> employee abused such access—the employer would have to
> show knowledge and an <u>unauthorized</u> opportunity to
> acquire or use trade secrets.

*RLM*, 831 F.3d at 201 (quoting G.S. § 66-155) (emphasis in original).

44.    Alternatively,    the    plaintiff    could    establish    an    inference    of

misappropriation by showing merely that the defendant had knowledge of the trade

secret and opportunity to acquire it.  *Id.*  The defendant could then rebut the inference

"by    showing    that    the    circumstances    surrounding    the    opportunity    were    not

suspicious," including showing that the opportunity was "provided with consent."  *Id.*

at 202; *see also Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 2002 NCBC

LEXIS 2, at \*43 (N.C. Super. Ct. July 10, 2002) ("Once plaintiff establishes a *prima*

*facie* case [of misappropriation], the burden shifts to defendants to show that the

trade secret was not acquired improperly.").  If the defendant meets its rebuttal

burden, the plaintiff could prove misappropriation by producing "evidence sufficient

to raise an inference of actual acquisition or use."  *RLM*, 831 F.3d at 202.  The Court

recognized that the practical impact of this second alternative proof scheme is that if

an employee accessed trade secrets at a time when he was authorized to do so, "the

framework will collapse into the question whether the [plaintiff] has sufficient evidence of misappropriation to raise an inference of actual acquisition or use of its trade secrets." *Id.*

45.     Plaintiff argues that the undisputed factual evidence raises an inference of actual acquisition of Plaintiff's trade secrets which entitle Plaintiff to judgment in its favor.  (Pl.'s Br. Supp. Mot. Partial Summ. J., ECF No. 45, at pp. 20–21; Pl.'s Br. Resp. Defs.' Mot. Summ. J., ECF No. 66, pp. 17–20.)   Plaintiff contends it is undisputed that Price accessed the TCOD, Salesforce, and SAP after he had agreed to employment with Camfil in or around the last few days of July 2016, but without Plaintiff's knowledge that Price was going to work for Camfil.  Plaintiff asserts that Price's access after he accepted employment with Camfil was unauthorized because Plaintiff has a policy and practice of terminating employees once Plaintiff learns they have accepted employment with a competitor.  As evidence of this policy, Plaintiff points to Price's testimony that he believed Plaintiff would likely have terminated him had he disclosed that he had accepted a job with Camfil.  (ECF No. 45, at p. 11; ECF No. 66, at pp. 6–7.)  Plaintiff argues the inference of misappropriation also is supported by the undisputed facts surrounding Price's secretive negotiation of employment with Camfil and his lack of candor with Plaintiff regarding the reason he was resigning his employment.  (ECF No. 45, at pp. 20–21.)

46.     Defendants, however, argue that the facts surrounding Price's access to the TCOD, Salesforce, and SAP establish that he did not acquire or use Plaintiff's trade secrets.  (ECF No. 49, at pp. 10–17; ECF No. 70, at pp. 9–14.)   Plaintiff

continued to provide Price access to the TCOD, Salesforce, and SAP for a week after Price notified Plaintiff of his resignation, albeit without disclosing his employment with Camfil. (ECF No. 70, at pp. 15–16.) Defendants also have introduced evidence that Plaintiff is unable to identify any other employee to which it has applied its alleged policy of terminating access of employees who accept employment with a competitor. (ECF No. 45.3, at pp. 8–9.) Defendants also contend that Price's testimony that he accessed the TCOD, Salesforce, and SAP only for purposes of completing his job duties with Plaintiff is unrebutted. (ECF No. 70, at pp. 16–17.) Finally, Defendants argue that Plaintiff has produced no evidence that Defendants have used Plaintiff's trade secrets to acquire Plaintiff's customers or create new technologies, or that Plaintiff has suffered any actual damages as a result of the use of Plaintiff's trade secrets. (ECF No. 70, at pp. 12–13.)

47.     The Court concludes that the facts surrounding Price's access to the TCOD, Salesforce, and SAP are in dispute and create genuine issues regarding whether Defendants actually acquired Plaintiff's trade secrets that must be resolved by a jury. Plaintiff's Motion for Partial Summary Judgment is DENIED as to Plaintiff's claim for misappropriation of trade secrets regarding information compiled in the TCOD, SAP, and Salesforce, and Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's claim for misappropriation of trade secrets regarding the TCOD, SAP, and Salesforce.

   vi.     *Plaintiff has presented no evidence of actual damages arising from misappropriation of its trade secrets*

48. Finally, Defendants argue that they should be granted summary judgment on the issue of actual damages under the NCTSPA because Plaintiff has not put forth any evidence that it suffered actual damages as a result of Price's alleged misappropriation. (ECF No. 49, at pp. 22–23.)

49. The Court agrees that Plaintiff has not presented any evidence that it suffered actual damages. In addition, Plaintiff does not make any argument in opposition to Defendants' request for summary judgment on the issue of actual damages but merely notes that it may still seek punitive damages under the NCTSPA based on an award of nominal damages. (ECF No. 66, at p. 25, citing *Hawkins v. Hawkins*, 101 N.C. App. 529, 532, 400 S.E.2d 472, 474 (1991) ("Once a cause of action is established, plaintiff is entitled to recover, as a matter of law, nominal damages, which in turn support an award of punitive damages.").) Accordingly, the facts regarding Plaintiff's entitlement to actual damages on its claims under the NCTSPA are not in dispute, and Defendants are entitled to summary judgment in their favor on this issue. Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's claim for actual damages under the NCTPSA.

## C. *Unfair and Deceptive Trade Practices*

50. Plaintiff and Defendants both move for summary judgment in their respective favors on Plaintiff's claim for unfair and deceptive trade practice in violation of the UDTPA. (ECF No. 5, at ¶¶ 117–121.) A claim for unfair and deceptive trade practices requires that the plaintiff show "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to

plaintiffs." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007).

51.     Misappropriation of trade secrets may form the basis of a UDTPA claim if the misappropriation satisfies the three required elements for an unfair trade practices claim. *Drouillard v. Keister Williams Newspaper Services, Inc.*, 108 N.C. App. 169, 172, 423 S.E.2d 324, 326 (1992) ("If the violation of the Trade Secrets Protection Act satisfies this three prong test, it would be a violation of [G.S.] § 75-1.1.") The Court already has concluded that issues of fact remain for resolution by a jury regarding Plaintiff's claim for misappropriation of trade secrets, and such claim could support Plaintiff's claim under the UDTPA.

52.     Defendants argue that Plaintiff's unfair trade practices claim fails because Plaintiff has not provided evidence that it suffered actual damages as a result of the alleged misappropriation of its trade secrets.   (ECF No. 49, at p. 24.) Defendants are incorrect.   In this case, if Plaintiff prevails on its claim for misappropriation of trade secrets, it would be entitled to an award of nominal damages even absent evidence of actual damages, which would be sufficient to support the claim under the UDTPA. *Estate of Hurst v. Moorehead I, LLC*, 228 N.C. App. 571, 583–85, 748 S.E.2d 568, 578 (2013) ("[A]n award of actual damages is not required to support a finding that plaintiffs were injured by the acts complained of. Rather, as the trial court instructed, the jury need only find that defendants' unfair or deceptive act or practice proximately caused an injury to plaintiffs . . . [and an]

award of nominal damages are sufficient to support [a claim] for unfair and deceptive trade practices.").

53. Plaintiff has not established that it is entitled to summary judgment on its claim for misappropriation of trade secrets because disputed issues of fact remain. Accordingly, Plaintiff's partial motion for summary judgment should be DENIED as to Plaintiff's claim for unfair and deceptive trade practices. However, since Plaintiff's claim for misappropriation of trade secrets survives the motion for summary judgment and could support a claim for unfair and deceptive trade practices, Defendants' motion for summary judgment should also be DENIED.

*D.    Conspiracy*

54. Plaintiff also claims that Price and Camfil "maliciously, willfully, wantonly, and intentionally conspired" to misappropriate and illegally use Plaintiff's trade secrets and to commit unfair and deceptive trade practices. (ECF No. 5, at ¶ 123.) Defendants move for summary judgment on Plaintiff's allegation of conspiracy, arguing that Plaintiff has not provided any evidence of an actual agreement between Price and Camfil that would support such a claim.

55. Civil conspiracy is not an independent cause of action in North Carolina; rather, liability for civil conspiracy must be alleged in conjunction with an underlying claim for unlawful conduct. *Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002). To state a claim for civil conspiracy, a plaintiff must show: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of

the conspirators; and (4) pursuant to a common scheme." *Piraino Bros., LLC v. Atlantic Fin. Grp., Inc.*, 211 N.C. App. 343, 350, 712 S.E.2d 328, 333 (2011). "[S]ufficient evidence of the agreement must exist to create more than a suspicion or conjecture in order to justify submission of the issue to a jury." *Boyd v. Drum*, 129 N.C. App. 586, 592, 501 S.E.2d 91, 96 (1998) (internal quotations omitted).

56.     Plaintiff has not put forth evidence in this case that Price entered into any agreement with Camfil to misappropriate trade secrets. The most Plaintiff has shown is that, after Plaintiff notified Camfil of Price's alleged obligations under his employment agreement, Brunetti discussed the issue with Price and Price subsequently sent Brunetti a list of Plaintiff's customers he had contacted, as well as a copy of the CFV Spreadsheet. (ECF No. 45.2, at pp. 111, 115; ECF No. 58.4, Ex. 23.) This is not, however, evidence that Camfil and Price made an agreement that Price would misappropriate trade secrets from Plaintiff or engage in any other unlawful conduct. Defendants' motion for summary judgment should be GRANTED as to Plaintiff's allegation of civil conspiracy.

THEREFORE, IT IS ORDERED that:

57.     Defendants' Motion to Strike is DENIED.

58.     Plaintiff's Motion for Partial Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's claim for misappropriation of trade secrets regarding the CFV Spreadsheet.

59.     Plaintiff's Motion for Partial Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's claim for

misappropriation of trade secrets regarding of the algorithms or "engines" underlying the TCOD or any other of Plaintiff's programs.

60.    Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment are DENIED as to Plaintiff's claim for misappropriation of trade secrets regarding information compiled in the TCOD, Salesforce, and SAP.

61.    Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's claim for actual damages under the NCTPSA.

62.    Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment are DENIED as to Plaintiff's claim for violation of the UDTPA.

63.    Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's allegation of civil conspiracy.

64.    Except as expressly granted herein, Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment are DENIED.

SO ORDERED, this the 10th day of July, 2018.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases